**J-T TRANSPORT COMPANY, Inc.,**
**Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants.**

**No. 12497.**

United States District Court
W. D. Missouri, W. D.
Aug. 9, 1960.

**840**

Wrape & Hernly, Memphis, Tenn., Gage, Moore, Park & Kreamer, Kansas City, Mo., for plaintiff, J-T Transport Co., Inc.

Knipmeyer, Milligan, McCann & Millett, Kansas City, Mo., Clarence D. Todd and Charles F. Riddle of Todd, Dillon & Singer, Washington, D. C., for intervening plaintiff, Contract Carrier Conference of American Trucking Assn.

J. H. Kreamer, Kansas City, Mo., for intervening plaintiff, Aerospace Industries Assn.

Robert A. Bicks, Asst. Atty. Gen., John H. D. Wigger, Dept. of Justice, Washington, D. C., Edward L. Scheufler, U. S. Atty., Kansas City, Mo., for U. S.

James Y. Piper, Washington, D. C., Robert W. Ginnane, Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

Paul F. Sullivan, James K. Knudson, Washington, D. C., Kretsinger & Kretsinger, Kansas City, Mo., for intervening defendant U.S.A.C. Transport, Inc.

John S. Fessenden, Roland Rice, Washington, D. C., John F. Edell, Kansas City, Mo., for intervening defendant, Regular Common Carrier Conference of American Trucking Assn., Inc.

Wilson, Woods & Villalon, Washington, D. C., Reeder, Griffin & Dysart, Kansas City, Mo., for intervening defendant, Common Carrier Conference—Irregular Route—of American Trucking Assn., Inc.

Before JOHNSEN and MATTHES, Circuit Judges, and SMITH, District Judge.

R. JASPER SMITH, District Judge.

This is an action brought under Sections 1336, 1398, 2284 and 2321 to 2325, inclusive, of Title 28 United States Code, to enjoin, set aside and annul orders of the Interstate Commerce Commission dated January 31, 1958, and June 15, 1959, and to compel action by the Interstate Commerce Commission unlawfully withheld upon the application of plaintiff in a proceeding under Section 205(g) of the Interstate Commerce Act (49 U.S. C.A. § 305(g)), to grant to plaintiff a permit as a contract carrier of certain property by motor vehicle from Indianapolis, Indiana, to Wichita, Kansas. By leave of Court Contract Carrier Conference of American Trucking Association, Inc. and Aerospace Industries Association of America, Inc., as Intervening Plaintiffs, and U.S.A.C. Transport, Inc., Regular Common Carrier Conference of American Trucking Association, Inc., and Common Carrier Conference—Irregular Route—of American Trucking Association, Inc., as Intervening Defendants, were allowed to intervene and file briefs.

Since 1953, plaintiff has held certain irregular route permits from the Commission as a contract carrier of property by motor vehicle. On March 14, 1957, it filed its application for an additional irregular route permit to authorize an extension of its operations in transporting aircraft assemblies, uncrated, requiring special handling and special equipment because of their fragile nature, from Indianapolis to Wichita. The application is supported by Boeing Aircraft Company, which operates a plant at Wichita for the production of airplanes.

The specific commodities to be transported are "landing gear bulkheads". They are purchased by Boeing from a manufacturer at Indianapolis, for installation at Boeing's assembly plant in Wichita. Each bulkhead weighs about 1380 pounds, it has a value of about $24,-000, and extreme care must be exercised in its transportation. Because of the nature of the commodity, crating as required for rail transportation is impracticable. Each bulkhead is manufactured for use in a particular airplane, and ordinarily, a bulkhead can be used

only in the plane for which it is manufactured.

Operating under its temporary authority, plaintiff has designed a specially constructed trailer, 35 feet long, 12½ feet high, and 8 feet wide. It utilizes this equipment in transporting the commodities for Boeing. It is possible to haul four bulkheads in one load, without special crating. Plaintiff's Wichita Terminal is located near the Boeing Plant, special equipment is assigned to the exclusive use of Boeing, and Boeing directs the movement of plaintiff's equipment which is available upon one hour's notice. The incoming bulkhead shipments are scheduled into Boeing's production line, for use on particular airplanes. Hence it is highly important that the bulkheads reach Boeing at a previously determined proper time to prevent disruption of production schedules. The bulkheads are unloaded directly into Boeing's production line. They are rigidly inspected by Boeing and the United States Air Force, and if there is material damage, they are returned to the Indianapolis plant. Security safeguards must be taken, and plaintiff's drivers all have "security clearance."

Rail service was used at one time, but the cost of crating, loading and unloading was prohibitive. Furthermore, because of Boeing's need to correlate these incoming shipments with its production schedule, rail service was not feasible.

U.S.A.C. Transport, Inc., as a motor common carrier, holds authority to operate, over irregular routes, in the transportation of aircraft parts, crated or uncrated, restricted to parts requiring special equipment or handling by reason of size, weight or fragile character, between the points involved in this application. It has never performed this transportation service for Boeing. It has indicated, however, that it, too, will design and construct any special equipment needed for hauling this commodity, and that it, in all other ways, stands ready and willing to serve Boeing's needs. It has no terminal or other facilities at Wichita, Kansas, although it does have terminal facilities at Indianapolis.

Boeing has urged that only very specialized contract carriage can reasonably satisfy its transportation requirements. Although it has not sought to utilize U.S. A.C.'s service in this particular operation, it had experienced unsatisfactory service by U.S.A.C. on a prior occasion in 1953.

Initial hearing on plaintiff's application was completed in May, 1957. On July 18, 1957, the Examiner filed his report recommending that the application be granted, and that the permit for contract carrier operation be issued. After reviewing the evidence described above, the Examiner, upon finding that "a need has been shown for the proposed operation and * * * a grant of such authority will not adversely affect present transportation facilities to any material extent * * *," concluded that a grant of authority would be consistent with the public interest and the national transportation policy.

On January 31, 1958, after exceptions were filed to the Examiner's recommendation, Division One of the Commission, Commissioners Hutchinson and McPherson participating, adopted the Examiner's findings as to facts, but ruled that inasmuch as plaintiff had failed to establish that the proposed operation would be consistent with the public interest and the national transportation policy, the application would be denied. No mention whatever was made concerning tests prescribed by Sections 203(a) (15) and 209(b) of the Interstate Commerce Act, as amended August 22, 1957. The basis for the finding was expressed as follows:

"The existing services of the opposing carriers which appeared to be in a position to handle the described traffic and are willing to modify equipment if necessary, have not been tried, much less shown to be inadequate * * * The burden is upon an applicant seeking contract carrier authority, as well as one

seeking common carrier authority, to establish, among other things, that *there is a need for the services proposed which existing carriers cannot or will not meet."* (Emphasis supplied.)

On July 25, 1958, the entire Commission denied petitions for reconsideration and oral argument. Subsequently, however, on October 16, 1958, the Commission reopened the proceeding for consideration, and the matter was held under advisement until June 15, 1959, when the decision of January 31, 1958, was reaffirmed.

In its second report, the Commission, in discussing the 1957 amendments to Sections 203(a) (15) and 209(b), observed that "the decisive factor" in ruling upon applications for contract carriage permits has always been whether "the available common carrier service was reasonably adequate" to "meet the reasonable transportation needs of those supporting the application", and that the 1957 amendments did not change this test. The Commission further concluded that, in determining the adverse effect upon protesting carriers, there is a presumption that an adverse effect will follow from a loss of *potential traffic,* even if it may not have been handled before. In further observing that Congress did not intend the tests of Section 209(b) to be exclusive, the Commission concluded that since the good of the national transportation policy as a whole must be considered, common carriers should be given the opportunity "to make an effective showing of their *willingness and ability* to provide needed service."

In applying the "new test", the Commission conceded that plaintiff met the definition of a contract carrier, and that, as to the number of contracts to be served, plaintiff is a "bonafide" contract carrier. It also conceded that the type of service proposed was properly that of a contract carrier (although common carriers might perform the same type of service); it found that U.S.A.C. would be adversely affected by the grant; and it found that plaintiff would suffer no

material adverse effects because its special equipment could be converted to other uses. As to the adverse effect upon Boeing, the Commission felt that this depended upon a determination of whether "existing service is adequate to meet their transportation requirements", and concluded that "(U.S.A.C.'s) ability and willingness to provide the service which (Boeing) require(s), and the fact that, with respect to the instant traffic (Boeing) has (not) attempted to avail itself of U.S.A.C.'s services, (prohibited a finding) that existing service has been shown to be inadequate." Commissioners Freas and Walrath concurred in the result. Commissioner Webb, in concurring, felt that the report prescribed a sixth test not authorized by Congress, and, in fact, specifically deleted by Congress, i. e., requiring the applicant to show that the protesting common carriers "are unwilling or unable" to meet the shipper's transportation requirements. Commissioner McPherson, who participated in the first report, dissented, concluding that Boeing required a specialized service which was within the definition of contract carriage, and upon weighing the effect of a grant or denial he would decide in favor of a grant of authority in this case. Commissioners Mitchell, Arpaia, and Winchell did not participate. Thus it apears that the report of June 15, 1959, represents the expressed views of four of the eleven Commissioners.

On August 22, 1957, significant changes were made in the Interstate Commerce Act in reference to contract carriers by motor vehicle. Our research indicates that this case is one of first impression in construing the provisions of the Act as amended. In testing the validity of the Commission's action here we are required to make analysis of the present statutory base under which the Commission acted. It therefore becomes necessary briefly to summarize the events giving rise to the 1957 amendments to the Act.

Before the amendment, Section 203(a) (15) of the Act, 49 U.S.C.A. § 303(a)·

(15), defined "contract carrier" in the following terms:

"The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation * * * by motor vehicle of passengers or property in interstate or foreign commerce for compensation."

Under old Section 209(b), 49 U.S.C.A. § 309(b), in ruling upon applications for contract carriage permits, and apart from applicant's burden of showing that it was qualified generally as a contract carrier, the Commission was guided only by the requirement that the proposed service be "consistent with the public interest and the national transportation policy." In contrast, a *common carrier* was required to establish that its proposed operation was required "by the present or future public convenience and necessity." 49 U.S.C.A. § 307(a).

In attempting to adjust the rights of contract and common carriers, the Commission found it necessary to expand and re-expand its interpretation of the Act. As a practical result, any difference in the standards and burden of proof on both types of applications became blurred, and sometimes interchangeable. Thus, in William Heim Cartage Co., Inc., Ext.—Indianapolis, 20 M.C.C. 329, 331, a *contract carrier* application, the Commission spoke in terms of applicant's burden of showing "that facilities of existing carriers * * * are inadequate, or that they are not rendering a type of character of service which satisfies the public need and convenience, and that the proposed service would tend to correct or substantially improve that condition."

In addition, the Commission began to read into Section 203(a) (15) a "specialization test" as a prerequisite to a finding of bonafide contract carriage. However, common carriers began to amend their tariffs so as to offer "specialized service" with the ultimate result that contract carriers frequently were denied their claims of specialization. In attempting to resolve the perplexities of applying the "specialization test," the Commission turned to a consideration of the *number* of shippers served by contracts, as a factor negating specialization.

Generally, common carriers complained that contract carriers, by adding more and more contracts to their service, in effect became common carriers, to the detriment of that section of the industry. Conversely, the contract carriers found that as common carriers likewise began to offer specialized services, aided by the Commission's specialization test and attitude toward the standards and burden of proof on contract carrier applications, it became increasingly difficult to secure contract carriage permits.

Although some prior steps had been taken by the Commission to secure legislation to "empower the Commission to limit the person or persons and the number or class of persons for which a contract carrier * * * may lawfully perform transportation services," and "to provide that motor contract carrier permits may be issued *only upon a showing that existing common carriers are unwilling or unable* to provide the type of service for which a need has been shown" (69th Annual Report of the Interstate Commerce Commission at page 132), the need for amendment of the Act was brought to the fore by the decision of the Supreme Court in United States v. Contract Steel Carriers, 1956, 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482. There the Commission had directed the contract carrier to cease operations as a common carrier, basing its order in part, upon the fact that the carrier, by active solicitation, had secured sixty-nine contracts to serve shippers. In affirming the three-judge district court which had reversed the order, the Supreme Court disapproved the Commission's specialization test insofar as it sought to limit the number of shippers which a contract carrier could serve. Although not specifically ruling upon the use of the test as a whole, the Supreme Court found that "if

specialization is to be read into 49 U.S.C. § 303(a) (15), 49 U.S.C.A. § 303(a) (15) by the legislative history, it is satisfied here since appellee hauls only strictly limited types of steel products under individual and continuing contractual agreements with a comparatively small number of shippers throughout a large area." Ibid., 350 U.S. at page 411, 76 S.Ct. at page 463.

Following this decision, the Commission caused bills to be introduced in Congress, H.R. 5123 in the House of Representatives, and S. 1384 in the Senate. These measures, identical in their provisions, would have amended Section 203 (a) (15) to redefine contract carriage as follows:

"The term 'contract carriage by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce for compensation * * * under continuing contracts with one person or a limited number of persons for the furnishing of transporation services of a special and individual nature required by the customer *and not provided by common carriers.*" (Emphasis added.)

Section 209(b) was to be amended by providing that a contract carrier permit could be issued only upon a showing "that existing common carriers are unwilling or unable to provide the type of service for which a need has been shown."

The inclusion of these clauses in the proposed amendments resulted in sharp opposition; and extensive hearings before the Senate Subcommittee are reported in a 358-page volume entitled "Surface Transportation—Scope of Authority of ICC—Hearings before a Subcommittee of the Committee on Interstate and Foreign Commerce, United States Senate, Eighty-Fifth Congress, First Session." (No. 92433 U. S. Government Printing Office, Washington, 1957.) During the hearings, the Commission proposed to delete the objection-

able language in Section 209(b); i. e., "that existing common carriers are unwilling or unable to provide the type of service for which a need has been shown," inasmuch as this would impose a "very difficult burden of proof" on applicants. After hearings, the House drafted an entirely new bill, and the Senate Committee released a drastically amended version of S. 1384. Although both bills were virtually identical, S. 1384 was finally enacted as Public Law 85–163.

Section 203(a) (15) of the Act, 49 U. S.C.A. § 303(a) (15) as amended August 22, 1957, reads as follows:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) * * * and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

Section 209(b) of the Act (49 U.S.C.A. § 309(b)) as amended August 22, 1957, reads as follows:

"Applications for such permits shall be made to the Commission in writing, be verified under oath, and shall be in such form and contain such information and be accompanied by proof of service upon such interested parties as the Commission may, by regulations, require. Subject to section 210, a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the applications or from any hearing

held thereon, that the applicant is fit, willing and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this part and the lawful requirements, rules, and regulations of the Commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the national transportation policy declared in this Act; otherwise such application shall be denied. *In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers and the effect which denying the permit would have upon the applicant and/or its shipper and the changing character of that shipper's requirements.* The Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof, and it shall attach to it at the time of issuance, and from time to time thereafter, such reasonable terms, conditions, and limitations, consistent with the character of the holder as a contract carrier, including terms, conditions and limitations respecting the person or persons and the number or class thereof for which the contract carrier may perform transportation service, as may be necessary to assure that the business is that of a contract carrier and within the scope of the permit, and to carry out with respect to the operation of such carrier the requirements established by the Commission under section 204(a)(2) and (6): Provided, That within the scope of the permit and any terms, conditions or limitations attached thereto, the carrier shall have the right to substitute or add to its equipment and facilities as the development of its business may require: Provided further, That no terms, conditions or limitations shall be imposed in any permit issued on or before the effective date of this proviso which shall restrict the right of the carrier to substitute similar contracts within the scope of such permit; or to add contracts within the scope of such permit unless upon investigation on its own motion or petition of an interested carrier the Commission shall find that the scope of the additional operations of the carrier is not confined to those of a contract carrier as defined in section 203(a)(15), as in force on and after the effective date of this proviso." (Italics supplied, representing a portion of the new matter added to this section.)

Thus while the Commission is still directed to issue a permit upon a finding that the proposed operation will be consistent with the public interest and the national transportation policy, in making this determination the Commission is now specifically required to consider and apply five statutory tests; namely, (1) the number of shippers to be served by the applicant, (2) the nature of the service proposed, (3) the effect which granting the permit would have upon the services of protesting carriers, (4) the effect which denying the permit would have upon the applicant and/or its shipper, and (5) the changing character of that shipper's requirements.

With this legislative history in mind, we must determine whether the Commission acted within the scope of the statute in denying the application; and, if so, whether its findings are supported by substantial evidence, viewing the record as a whole.

Plaintiff urges that the effect of the Commission's decision is to apply the very standard first proposed in the amendments and subsequently withdrawn. With this contention we agree.

While the Commission apparently concedes that it no longer may deny a contract application upon the ground that applicant has failed to sustain the burden of proving that common carriers are "unwilling or unable" to perform the proposed service, it contends that in all instances under Section 209(b) it is proper to consider the "adequacy of existing services" in making a determination upon an application for new services. However, we are convinced that in determining whether a denial of the permit would adversely affect the shipper in this instance, the Commission gave improper consideration to U.S.A.C.'s *willingness and ability* to perform, and that it further erred in conceiving its responsibility under Section 209(b). The Commission goes beyond the language and scope of the statute when it assumes and requires:

(a) That applicant carries the burden of showing that existing services are inadequate; and

(b) That the expressed "willingness and ability" of opposing carriers, together with absence of proof that such service has been tried and found wanting, ipso facto vitiates a contention that the service is "needed" by shipper, or that denial of the application will have an adverse effect upon shipper.

Subsequent decisions of the Commission in contract carriage proceedings demonstrate rather forcibly that the Commission applied the "willing and able" test herein, and that it continues to pursue this course. In Carolina Haulers, Inc., Contract Carrier Application, No. MC–116825 (April 28, 1958) 76 M.C.C. 254, 256, we find the Commission stating:

*"If sound economic conditions are to be maintained in the industry and a strong transportation system developed, existing available motor carriers, before being deprived of desirable and needed traffic which they are able to handle efficiently, must be shown to be unwilling or unable to meet the shipper's reason-*

*able transportation needs."* (Emphasis supplied.)

In Leo Holt, Jr., Extension—Pilings, No. MC–85087 (July 14, 1958) 77 M.C.C. 141 at page 144, this language is noted:

"Although both motor-carrier protestants are common carriers, there is no convincing evidence that applicant would provide any service to the supporting shipper which these protestants are *unable or unwilling* to provide * * * We conclude that applicant has failed to sustain his burden of showing a need for the proposed service." (Emphasis supplied.)

In Wagner Contract Carrier Application, No. MC–117010 (October 23, 1958), 77 M.C.C. 777, at page 781, it was stated:

"We have held repeatedly that the existing motor carriers are entitled to all authorized traffic that they can handle economically and efficiently, before a new competing service may be authorized therefor, unless it can show that such existing carriers are *unwilling or unable* to meet the public's reasonable transportation needs within the authorized territories." (Emphasis supplied.)

In Roy D. Yiengst Common Carrier Application, No. MC–117308 (April 17, 1959), 79 M.C.C. 265 at page 268, the Commission, in denying the petitioner's application as a *common carrier* for a certificate of *public convenience and necessity,* used language almost identical to that just quoted in the Wagner contract carrier application:

"We have held repeatedly that the existing motor carriers are entitled to all authorized traffic that they can handle adequately and efficiently before a new competing service may be authorized therefor, in the absence, as here, of any showing that the existing carriers are unwilling or unable to provide needed service within the authorized territories."

In E. L. Reddish Contract Carrier Application, No. MC–117391 (June 30,

1959), 81 M.C.C. 35, at page 40, the Commission, in citing its opinion here as authority for denial of the application, ruled upon applicant's contention that the willingness and ability of common carriers to provide the service should be given little weight by stating, "these issues were there (in the J–T case) resolved in a manner contrary to that urged by applicant; and it was found that the availability of common-carrier service is a relevant matter which must be considered in disposing of contract-carrier application."

As to the statements quoted in Wagner and Yiengst, supra, compare the 1939 statement of the Commission in William Heim Cartage Company, Inc., Extension —Indianapolis, 20 M.C.C. 329, supra, at page 332:

> "The Commission has consistently stated that it is its belief that, in order to foster a sound transportation system, existing motor carrier should normally be accorded the right to transport all traffic which they can handle adequately, efficiently, and economically in the territory served by them, as against any person now seeking to enter the field of motor-carrier transportation * * *."

■ It is conceded that the purpose of the new legislation was to give the Commission more helpful standards than were contained in the present law. Certainly the burden of proving a contract carrier operation to be consistent with the public interest and the national transportation policy was not eliminated by the 1957 amendment.[1] The standards of meeting this responsibility were changed, however, and as we read the statute these standards do not involve a showing that common carriers are unwilling or unable to handle the traffic; or, stated otherwise, that common carrier service is inadequate. Under old Section 209(b), the only statutory requirement to qualify as a contract carrier was that the transportation be performed under individual contracts, and there was no limitation on the number of contracts. There was nothing to prevent a contract carrier, once it obtained a permit, from aggressively searching for new business within the limits of his permit, even though the authority may have been granted originally on the basis of the support of a single shipper.

The new sections sharply redefine contract carriage and give the Commission power to limit the number of contracts which a contract carrier can maintain. The Commission acquired the power to limit the service of the contract carrier to the shipper or shippers supporting the application. Congress set forth specific criteria to be considered, and deleted the test previously applied by the Commission involving a determination of adequacy of existing common carrier service.

Defendants suggest that the specific criteria enumerated in the statute are not exclusive, but are only guides to be con-

1. The National Transportation Policy, 49 U.S.C.A. note preceding Section 301, enacted September 18, 1940, provides as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of the Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

sidered "among other things" in the context of the public interest and the national transportation policy. Of course the ultimate determination is whether or not a proposed contract carrier operation is consistent with the public interest and the national transportation policy. In making this determination, however, the Commission is directed specifically to consider five definite criteria. When the Commission injects a sixth criterion, specifically rejected by Congress, it clearly has erred.

The Commission by its orders found that plaintiff fulfilled the statutory requirements for a "contract carrier by motor vehicle" as prescribed by Section 203(a)(15). In applying the criteria prescribed by Congress in Section 209 (b), the Commission correctly found that plaintiff met the requirements of the first and second tests, and, by implication, the fifth test. The decisive questions here involve the third and fourth criteria, requiring a consideration of the effect which granting the permit may have upon the services of protesting carriers, as well as the effect which denying the permit would have upon the applicant and its shipper.

■ Consideration of the effect on the services of protesting carriers does not contemplate consideration of the mere existence or availability of a protesting carrier, but rather what effect, if any, granting a permit would have on the existing services of that carrier. The Commission bases its decision here on the presumption that if an existing common carrier is able and willing to perform services for the shipper or, stated alternatively, that existing common carrier service is adequate, the effect on existing protesting common carrier services is adverse. Thus, since the Commission aids itself by a presumption, under this interpretation the "very difficult burden of proof" remains with the applicant and proposed shipper to negate the adverse effect on existing common carriers. The effect of this is to inject precisely the standard which was deleted

by Congress at the time of enactment of the new section.

The consideration of the effect on the services of protesting carriers is designed to afford a measure of protection for those carriers. This criterion does not contemplate consideration of the mere existence or availability of a protesting carrier, but rather what effect, if any, granting of a permit would have on the services of the carrier. If the protesting carrier was actually serving a shipper and participating in the traffic involved, the granting of a permit would divert traffic from the protesting carrier, and if this diversion would cause the services of the protesting carrier to be adversely affected to a material degree, this element certainly should be considered by the Commission. Where, however, the protesting carrier is not participating in the traffic involved, there can be no diversion of traffic and hence ordinarily there would be no adverse effect on the services of the protesting carrier.

■ The fourth criterion involves a consideration of the effect which denying a permit would have on the applicant and/or its shipper. This provision quite obviously was inserted in order to protect the shipper and the applicant, and to insure that their interests would receive the same consideration and be weighed in the same balance as those of opposing carriers. And to a notable degree, this provision emphasizes the new distinction required by Congress between a common carrier certificate of public convenience and necessity, and the contract carrier's permit.

It is quite clear that the Commission has entirely misconceived the purport of the 1957 amendments, and its function and duty with regard to the criteria set out in Section 209(b). The Commission continues to cling to its old tests and reasoning, and Congress has decreed otherwise.

The statute now contemplates two forms of motor carrier service. And quite obviously and clearly, under the

statute a contract carrier's permit cannot be limited and restricted to cases where no common carrier service is available. Now an element of shipper's service has been affirmatively recognized by Congress, and here it is quite clear that the proposed contract carrier service is designed to meet the distinct particular needs of Boeing and that in its operation it has met that need. Under the statute a shipper is entitled to have his distinct needs met. In carrying out this new philosophy of motor carrier service, Congress has clearly indicated that the Commission must recognize contract carrier service as a form of transportation applicable when the special needs of each service are considered, under the national transportation policy.

The new statute says that a permit *shall* be issued if it appears that the applicant is fit, willing and able to perform, and that the proposed operation will be consistent with the public interest and the national transportation policy. Note that this does not say that grounds for a certificate of public convenience and necessity must exist. Note further that the criteria set out in Section 209(b) are factors to be considered. The term "considered" may be defined in this connection as weighed or balanced. This does not mean necessarily, that because an applicant fails to meet affirmatively all five of the standards or tests prescribed by Congress, the Commission is warranted in rejecting the application. It must be recognized that Congress intended to and did by the contract carrier provisions of the statute establish a complementary system of motor transportation insofar as this was possible as a matter of consistency with the public interest and the national transportation policy declared in the Act.

Thus, in weighing these various factors, one against the other, we reach the conclusion that even though the Commission may find that issuance of a permit will in fact adversely affect a protesting carrier, that in and of itself does not necessarily justify a denial of the permit. The statute does not say, "The permit shall be issued, unless an existing carrier will be adversely affected." It does set out clearly and concisely the standards by which the Commission must be guided, and there is no longer a need to resort to special tests beyond the language of the statute, which may have been necessary in making determinations prior to the amendments. The five criteria in Section 209(b) are broad and inclusive, and when given proper application, in light of the evidence, the Commission should, without the injection of other factors, be able to make a proper disposition of the application.

We conclude that decisions turning solely on the "adequacy-willingness and ability" test cannot be justified and are clearly erroneous. There can be no doubt that this case was decided by the Commission on that basis. Nothing in the record before us warrants a denial of the application on any other grounds. Here a distinct need of an individual customer for specialized service and equipment was shown. A shipper desired it and asked for it, and within the scope of the revised definition of a contract carrier, the shipper's desires and the applicant's ability to meet them have achieved substantial pertinence.

Since the order denying the application must be vacated, we observe further that apart from the fact that a finding of an adverse effect upon U.S.A.C. would not in and of itself justify a denial of the application, there is in this record no substantial evidence to support the Commission's finding that the issuance of the permit would adversely affect the *services* of U.S.A.C. which had never handled or transported the commodities in question. Since U.S.A.C. is not participating in the traffic and never has been, the permit cannot possibly divert such traffic. There is no evidence in the record that if the permit is denied, U.S.A.C. or any other existing carrier will ever be permitted to serve the needs of Boeing. And in this connection it should be noted that in reaching the conclusion that the shipper will suffer no adverse effect because U.S.A.C. is willing and able to per-

form, the Commission has entirely ignored the affirmative evidence of Boeing's specific need for a contract type service and the special problems it faces. No consideration was given to the special services which in fact could not be supplied by a common carrier. The Commission has neatly solved the problem with its finding that common carrier service is "adequate". Inasmuch as the "willing and able" test at times seems indistinguishable from, and in the eyes of the Commission, synonymous with, the "adequacy test", a finding by the Commission that existing common carrier service is "adequate to meet the reasonable transportation needs" of the shipper fails to take into account that the new test under Section 203(a)(15) is whether the service is "designed to meet the *distinct need* of each individual customer." While existing *specialized services* of common carriers may very well be adequate to supply the shipper's *"reasonable transportation needs"*, that existing service may not in fact meet the *distinct* or *specific* need of the supporting shipper.

■ We conclude that to the extent the Commission has ruled that the burden is on applicant to show the protesting common carriers are unable or unwilling to meet the shipper's reasonable transportation requirements, the standard is not supported by the language of Section 209(b), whether it goes under the guise of an "adequacy test" or otherwise. It in effect injects into the Act the very qualifications and limitations suggested by the deleted portions of the amendment. The Commission may not rule that the proposed service fails to qualify as contract carriage under Section 203(a)(15) inasmuch as the service is, or may be "provided by common carriers." Neither may the Commission deny a permit under Section 209(b) because the applicant has failed to establish that existing common carriers are "unwilling or unable to provide the type of service for which a need has been shown."

We conclude generally that to the extent that the Commission has attempted to apply substantially the same tests for determining public convenience and necessity as it relates to common carriage to the narrowly restricted language of the statute relating to consistency with the public interest as it applies to contract carriage, the action is not supported by the language of Section 209(b).

It is of interest to note that at one time the Commission recognized a difference in the standards of proof required to show consistency with the public interest incident to a contract carrier's permit, as compared to the certificate of public convenience and necessity required for a common carrier. Earlier, it was required that once a contract carrier applicant had established a prima facie case, there was some burden on the protestants to come forward with evidence in rebuttal. See Jason W. House Contract Carrier Application, 1 M.C.C. 725. At about the same time the Commission held that the availability of adequate common carrier service alone did not preclude the granting of a contract carrier authority. See T. J. Broom Contract Carrier Application, 1 M.C.C. 425; Howard W. Juett Contract Carrier Application, 1 M.C.C. 268. Clearly the effect of the amended statute is to restore these procedures to a degree, and to give emphasis to the shipper's preference, which underlies the special concept of contract carriage in any case. And it is clear that under the narrow definition of contract carriage found in the new law, there is no occasion, necessity or warrant for the same standards of proof in both applications.

■ The Commission cites many of its own rulings since the 1957 amendments under the well established theory that contemporaneous construction of a statute by those charged with its execution is entitled to great weight and should be affirmed unless clearly erroneous. However, the construction of a statute is a matter ultimately for the Courts to determine. Where the Commission's construction is clearly erroneous, the rule contended for does not apply. See Woods v. Benson Hotel Corp.,

8 Cir., 1949, 177 F.2d 543; Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410; Mid-Continent Petroleum Corp. v. N. L. R. B., 6 Cir., 1953, 204 F.2d 613, certiorari denied 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 369.

■■ Plaintiff urges that we compel action by the Interstate Commerce Commission unlawfully withheld upon the application of plaintiff, and requests that we direct the Interstate Commerce Commission to issue to plaintiff a permit authorizing it to perform the transportation recommended by the Examiner. We have no such authority. Courts of review have no power to order an administrative body to perform discretionary acts in a particular manner, or themselves to exercise administrative functions. See Interstate Commerce Commission v. United States ex rel. Members of Waste Merchants' Ass'n, 260 U.S. 32, 43 S.Ct. 6, 67 L.Ed. 112; Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561; Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15.

In the final analysis the Commission has the responsibility for determining what is best for the public interest and the national transportation policy, weighing the various criteria that Congress has provided. The most that the courts may require is that all relevant factors be weighed carefully and fairly, and in this case, that no application be brushed aside upon the ground that an existing carrier wishes to perform the service. Again we emphasize that under the present statutory scheme, the shipper, the contract carrier and the common carrier all have coordinate interests; that there are now at least two forms of motor carrier service entitled to equal recognition, and that the interests of each must receive a fair consideration in reaching a determination which is consistent with the public interest and the policy of Congress with reference to national transportation.

For the foregoing reasons judgment will be entered setting aside the orders of the Interstate Commerce Commission and declaring them unlawful and void, and remanding the case to the Commission for further proceedings consistent with the rulings expressed here.