Elvin L. REDDISH, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

Contract Carrier Conference of American Trucking Associations, Inc., Intervening Plaintiff,

L. A. Tucker Truck Lines, Inc., Orscheln Bros. Truck Lines, Inc., Arkansas-Best, Freight System, Inc., East Texas Motor Freight Lines, Inc., Gillette Motor Transport, Inc., Western Truck Lines, Ltd., Regular Common Carrier Conference of The American Trucking Associations, Inc., Atchison, Topeka & Santa Fe Railway Company, and 31 Other Class I Rail Carriers in Western Truck Line Territory, Intervening Defendants.

Civ. A. No. 1531.

United States District Court
W. D. Arkansas,
Fort Smith Division.
Oct. 19, 1960.

John H. Joyce, Fayetteville, Ark., A. Alvis Layne, Washington, D. C., for plaintiff.

Todd, Dillon & Singer, Washington, D. C., for intervening plaintiff.

Richard H. Stern, Dept. of Justice, Washington, D. C., Chas. W. Atkinson, U. S. Atty., Fort Smith, Ark., for the United States.

Arthur J. Cerra, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

LaTourette & Rebman, St. Louis, Mo., Harper, Harper, Young & Durden, Fort Smith, Ark., Rice, Carpenter & Carraway, Washington, D. C., Callaway, Reed, Kidwell & Brooks, Dallas, Tex., Warner, Warner & Ragon, Fort Smith, Ark., E. L. Ryan, Jr., Chicago, Rock Island & Pacific R. R. Co., Chicago, Ill., for intervening defendants.

Before MATTHES, Circuit Judge, and MILLER and YOUNG, District Judges.

YOUNG, District Judge.

This is an action before a three-judge district court to enjoin and set aside orders of the Interstate Commerce Commission which denied plaintiff, Elvin L. Reddish, permanent authority to operate as a contract carrier by motor vehicle in interstate commerce. 28 U.S.C. §§ 1336, 1398, 2284 and 2321 through 2325 inclusive. By statute, the action is against the United States, represented by the Attorney General, while the Interstate Commerce Commission is made a party by right. 28 U.S.C. § 2323 (1958).

The Contract Carrier Conference of the American Trucking Associations, Inc., intervened before the Commission, and in this action on behalf of the plaintiff. The Commission is supported, in turn, by six common motor carriers, 32 railroads, and the Regular Common Carrier Conference of the American Trucking Associations, Inc., all of whom intervened before the Commission and in this action in opposition to the authority sought by plaintiff.

In its answer, the United States admitted all of the allegations of the complaint.[1] The United States filed a brief in this Court in support of its position that the orders of the Commission should be set aside and the cause remanded for further proceedings. Counsel for the

---

1. Paragraph 12 of the complaint alleged: "The Orders of the Interstate Commerce Commission dated June 30, 1959 and December 16, 1959 are erroneous and void as a matter of law for the reason that they are arbitrary and capricious and without foundation in substantial evidence in the record considered as a whole."

Government also appeared at the hearing and presented oral argument. In summary, the Government's position is that the Commission erred (1) in concluding that grant of the application would adversely affect the protesting carriers; (2) in concluding that denial of the application would not adversely affect the supporting shippers.[2]

The Interstate Commerce Commission, in its answer, denied that its action in denying plaintiff the permit he requested was unlawful, and stated that the action it had taken was fully supported and justified by the record.

The trial examiner of the Commission found that the service proposed by plaintiff would be consistent with the public interest and the national transportation policy, and recommended that the authority requested be granted. Division 1 of the Commission, however, denied the authorization requested, although the trial examiner's findings of fact were adopted by the Commission as their own. The action of Division 1 was sustained by the full Commission, which held:

"(a) that the findings of Division 1 are in accordance with evidence and the applicable law, and (b) that no sufficient cause appears, for reopening the proceeding for reconsideration or for oral argument."

This action was brought by plaintiff for judicial review of this denial by the Commission.

There is no material dispute as to the facts. They are as follows:

Plaintiff requests permanent authority to operate as a contract carrier for Steele Canning Company and Cain Canning Company of Springdale, Arkansas, and for Keystone Packing Company of Fort Smith, Arkansas. He proposes to handle pool-truck shipments of less-than-truckload orders intended for delivery in 33 states, and to handle certain canning supplies on his return trips from 30 of these states. Steele Canning Company is the major shipper of the three that plaintiff proposes to serve. Steele normally purchases about 75% of the production of Cain and Keystone, which Steele in turn resells to the wholesale and retail market. Steele began transporting its own small order loads in 1948. This operation increased as Steele's small order business increased, until the fleet of trucks operated by Steele numbered 29 in January of 1958. Throughout this period Steel handled most of its truckload shipments by common carrier, principally Jones Truck Line, Inc., of Springdale, Arkansas, who supports the plaintiff's application to handle the less-than-truckload orders.

Steele's less-than-truckload orders account for approximately 80% of its business, which it transported almost exclusively by its own private carriage until June of 1958, when a labor dispute interfered with such operations. Steele at that time prompted plaintiff to apply for authority to handle this operation as a contract carrier. In June 1958 the Commission granted plaintiff temporary operating authority substantially as requested by him. The service rendered by plaintiff under such authority was found by the trial examiner to be substantially similar to the private carrier operations previously performed by Steele. The contract service rendered by plaintiff to Cain and to Keystone largely involves their sales to Steele, but both are interested in developing their own less-than-truckload business, which plaintiff would handle.

The three canners insist that the only satisfactory alternative to private carriage is contract carriage of the type plaintiff proposes to offer and which he has performed for them under temporary

---

2. Encompassed in the second point is the contention that the Commission erred in treating as irrelevant the injury to supporting shippers caused by the higher cost of common carrier service; erred in concluding that the supporting shippers would not be adversely affected by withholding from them a contract-carrier service meeting transportation needs which the existing common carriers do not adequately meet.

operating authority. Their business is intensely competitive and has a small margin of profit. Most small order accounts operate on small inventories, making it critical that their orders be filled promptly. Further, Steele has found that many of its customers have special unloading times and requirements which must be observed at risk of the loss of that business. Because of these facts and because of the scattered location of the small order customers throughout the 33 states named in plaintiff's application, these three canners insist that they would not be in a competitive position if forced to rely upon common carriers for delivery of less-than-truckload orders. Delays in "interlining" shipments, coupled with what the canners regard as "prohibitive" common carrier less-than-truckload rates, would, they say, place them at a disadvantage as to their competitors, who maintain their own fleets of trucks. The canners intend to abandon their private carriage operations and, in effect, use plaintiff as though he were their shipping department.

While the trial examiner found that some less-than-truckload shipments which require delivery stops for a portion of the freight at one or two points enroute to final destination had been satisfactorily handled by common carrier, the traffic that the three canning companies proposed giving plaintiff involves from three to ten stops, with six stops being approximately the average less-than-truckload pooled shipment. This business has not in the past been handled by the protestant common carriers and, say the three shippers, will continue to be handled by private carriage if plaintiff's application is not granted, though the protestant common carriers insist that their experience indicates that they will receive some of this traffic if it is not handled by a contract carrier.

### I

█ The limits of permissible judicial review of the order of the Interstate Commerce Commission here in question are determined by Section 10(e) of the Administrative Procedure Act. 60 Stat. 243 (1946), 5 U.S.C.A. § 1009(e). The appeal is upon the record made before the Commission and its order must be sustained if it is supported by substantial evidence when viewed on the record as a whole and if the action taken is within the scope of its lawful authority. Universal Camera Corporation v. National Labor Relations Board, 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456. Plaintiff alleges that the order under review lacks substantive support for several findings and conclusions expressed by Division 1 in its report, and further alleges that the report applies a test not permitted by statute.

Our review of the record has convinced us that the plaintiff is correct in these contentions.

### II

█ In declaring the national transportation policy, Congress included the following goals:

" * * * to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices * * *." 54 Stat. 899 (1940), 49 U.S.C.A. preceding section 1.

We need not decide whether contract motor carriers are a separate "mode" of transportation from common motor carriers to hold, as we do, that the goal of the national transportation policy encompasses all modes and all carriers subject to regulation.

A contract carrier by motor vehicle is defined by statute as:

" * * * any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation * * * [other than common carriers], under continuing

contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer." 71 Stat. 411 (1957), as amended, 49 U.S.C.A. § 303(a) (15).

The Commission found that plaintiff would fit this definition, but upon its review of the entire case concluded:

"It is clear that authorization of a new carrier to transport traffic which common carrier protestant can efficiently handle would have an adverse affect upon the service of that protestant. See J-T Transport, supra.

\* \* \* \* \* \*

"There has been no convincing showing by applicant that the supporting shippers have a real need for the proposed contract carrier service. On the contrary, the only serious complaint which shippers have against existing service is with the less-than-truckload rates of motor common carriers. Even should the application be granted, they assert, they will continue to use common carrier service to some extent. It may be fairly concluded, we believe, that their support of this application rests entirely upon a desire to obtain lower rates. This is not a sufficient basis to justify a grant of authority to a new carrier. If the shippers believe that the rates of presently authorized carriers are unjust or unreasonable, they should seek relief in actions against these carriers under appropriate provisions of the act. Under the circumstances, the application will be denied."

The applicable section of the Interstate Commerce Act provides:

"Subject to \* \* \* [the provision against holding both a common carrier certificate and a contract carrier permit], a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the applications or from any hearing held thereon, that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this chapter and the lawful requirements, rules, and regulations of the Commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the national transportation policy declared in the Interstate Commerce Act; otherwise such application shall be denied. In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in the Interstate Commerce Act, the Commission shall consider [1] the number of shippers to be served by the applicant, [2] the nature of the service proposed, [3] the effect which granting the permit would have upon the services of the protesting carriers and [4] the effect which denying the permit would have upon the applicant and/or its shipper and [5] the changing character of that shipper's requirements." 71 Stat. 411 (1957), 49 U.S.C.A. § 309(b).

There is no contention that plaintiff has not demonstrated his fitness and ability to meet the first two requirements for the issuance of a permit, and as is said in the Commission's opinion, the fifth matter for consideration is not involved. As shown above, the Commission found that the granting of the permit would have an adverse effect upon the protesting common carriers because such carriers could efficiently handle the business, and there was no adequate showing that the supporting shippers had a real need for the proposed service. Thus, the third and fourth criteria enumerated in the act are the only ones involved, and it is upon these conclusions that the Commission denied plaintiff a

permit as not being consistent with the public interest and the national transportation policy.

■■ The statutory enumeration of factors for Commission consideration in determining consistency with the public interest and national transportation policy specifically includes the effect that a denial of the permit would have upon the supporting shippers, but as interpreted by the Commission,

> " * * * whether the shippers would be adversely affected by a denial must depend upon a determination of whether existing service is adequate to meet their transportation requirements."

We find no authority for limiting the inquiry as to the effect of a denial of a permit to a mere inquiry as to the adequacy of presently available service. Indeed, as applied by the Commission in this case, there is no distinction between this test and the test of proving public convenience and necessity that must be met by applicants for a common carrier certificate.

Considering all of the record, including the evidence of the lower cost of plaintiff's proposed service, it is clear that substantive evidence does not support the Commission's finding that the supporting shippers will not be adversely affected by a denial of this application; the record, the findings of the examiner, and the specific findings of fact stated by Division 1 in its report all indicate the contrary—the alternative faced by the shippers if the application is denied is the operation of their own trucks, in substantial numbers, in private carriage; common carriers are not an adequate substitute, and for that reason are not utilized. It does not do to say that the record is devoid of any substantial showing of dissatisfaction by the shippers with existing service because the complaints are not substantiated by reference to specific instances, or to hold that the shippers failed to show that they had been unable to obtain reasonably adequate service upon request because existing common carriers, other than Jones,

had been almost completely untried in recent years. The record clearly reveals that the shippers, particularly Steele Canning Company, are reasonably familiar with the services, including less-than-truckload rates, of the protestant shippers, and have not used them for the traffic in question because these services are inadequate.

Further, the "adequacy of existing service" test as applied by the Commission in this case in its determination of the effect upon supporting shippers of a denial of the permit is a test proscribed by the legislative history of the Interstate Commerce Act. In 1957 the Commission proposed to Congress several changes in the Act to enable it to better regulate contract carriers. As proposed, § 203(a) (15) of the Act [49 U.S.C.A. § 303(a) (15)] would have defined the term contract carrier by motor vehicle as meaning:

> " * * * any person which engaged in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation * * *, under continuing contracts with one person or a limited number of persons for the furnishing of transportation services of a special and individual nature required by the customer and not provided by common carriers."

Section 209(b) [49 U.S.C.A. § 309(b)] would have been changed to insert the requirement "that existing common carriers are unwilling or unable to provide the type of service for which a need has been shown". The amendment of the Interstate Commerce Act does not contain such language, however, and as amended by Public Law 85–163, 71 Stat. 411, the two sections read as previously quoted in this opinion.

Our study of the legislative history of this Act convinces us that the deletion of the willingness and ability test was at the specific protest of the contract carriers, some of their supporting shippers, the Department of Commerce and the Department of Justice. In its place were substituted the five specifications of items

to be considered by the Commission in determining whether the requested permit would be consistent with the public interest and the national transportation policy, and to this change the Interstate Commerce Commission expressed its approval. S.Rep.No. 703, 85th Cong., 1st Sess. (1957) (Report of Senate Committee on bill which became Public Law 85–163, 71 Stat. 411). See, J-T Transport Co., Inc., Extension—Columbus, Ohio, 79 M.C.C. 695, 711 (Concurring opinion, Walrath, Commissioner) (1959).

We do not believe that there is any difference between the "willingness and ability" test deleted by Congress from the bill proposed by the Commission and the "adequacy of service" test which the Commission said it applied in this case—a separate test, it maintains, from the one deleted. We believe that the Commission's own opinion in this case shows that it did apply the "willingness and ability" test:

"Applicant argues in his reply [referring to the 1957 amendments] that the willingness and ability of common carriers to provide needed service should be given but little weight in determining whether an application for contract-carrier authority should be granted. Similar contentions were considered by the entire Commission in No. MC–11185 (Sub-No. 100) J-T Transport, Inc., Extension—Columbus, Ohio, M.C.C., decided June 15, 1959; these issues were there resolved in a manner contrary to that urged by applicant; and it was found that the availability of common carrier service is a relevant matter which must be considered in disposing of contract carrier applications."

The decision of the Commission in the J-T Transport, Inc. case was attacked in a proceeding instituted by that applicant in the district court for the Western District of Missouri, Western Division, in the case of J-T Transport Co., Inc., v. United States. The three-judge court in that case handed down its opinion August 9, 1960, 185 F.Supp. 838, setting aside the order of the Commission for wrongfully applying the new criteria prescribed by the 1957 amendment to the Interstate Commerce Act. This case was one of first impression in construing the new status of an applicant for a permit as contract carrier when opposed by common carriers on the ground that adequate service was already available by common carrier. In that case, the court discusses exhaustively the legislative history of the 1957 amendments and concludes at page 848 of 185 F.Supp.:

"The Commission bases its decision here on the presumption that if an existing common carrier is able and willing to perform services for the shipper or, stated alternatively, that existing common carrier service is adequate, the effect on existing protesting common carrier services is adverse. * * * The effect of this is to inject precisely the standard which was deleted by Congress at the time of enactment of the new section."

In this case, the only evidence of the adequacy of existing service to meet the transportation requirements of the supporting shippers came from the testimony of common carriers that they were willing and able to serve, though they had not been called upon by the shippers to do so in recent years as to the traffic in question; all the other testimony was to the effect that the existing service was considered inadequate by the shippers.

We do not believe that it was the intent of Congress that the approval or disapproval of an application for a contract carrier permit should be determined solely by reference to whether or not the proposed service is provided by common carriers, or one which they are unwilling or unable to provide. Sufficient tests and safeguards to control the granting of contract carrier permits are contained in the law to protect common carriers without the imposition by the Commission of a test which Congress deemed improper.

As the Court said in overruling the Commission in the J-T Transport case:

"Thus, in weighing these various factors, one against the other, we reach the conclusion that even

though the Commission may find that issuance of a permit will in fact adversely affect a protesting carrier, that in and of itself does not necessarily justify a denial of the permit. The statute does not say, 'The permit shall be issued, unless an existing carrier will be adversely affected.' It does set out clearly and concisely the standards by which the Commission must be guided, and there is no longer a need to resort to special tests beyond the language of the statute, which may have been necessary in making determinations prior to the amendments. The five criteria in Section 209(b) are broad and inclusive, and when given proper application, in light of the evidence, the Commission should, without the injection of other factors, be able to make a proper disposition of the application."

### III

■ Neither do we believe that lower costs in the form of rates may be ignored in determining the effect denying the permit would have upon the shippers. Congress has declared one of the goals of our national transportation policy is to promote "economical" service.

■ We are not to be understood as saying that evidence of lower rates is always important, or determinative, when weighing evidence in support of a contract carriage application against that presented by protestant common carriers. Our holding is that where the lower rates result from economies and advantages inherent in contract carrier operation, as they do in this instance, and there is a showing that efficient business operation requires the proposed tailored service—including the lower rates, as is reflected by the record in this instance, the Commission may not disregard this evidence in its evaluation of the effect of a denial of the permit upon the applicant's supporting shippers. Mere cost-cutting or profit-shaving need not be considered perhaps, but evidence of efficient operation must be heeded.

### IV

In considering the effect which granting of the permit would have upon the services of the protesting carriers, the Commission concluded, as heretofore stated, that the authorization of a new carrier to transport traffic which common carrier protestants could efficiently handle would have an adverse effect upon the service of such common carriers.

Whatever the validity of this presumption generally, it is overcome in this case by the evidence in the record, which establishes, we think, not only that the protestant common carriers have not handled this traffic but would not handle it if the permit were denied.

Even if it is assumed that some adverse effect would result from the granting of this permit, no consideration was given to the special services which could not be supplied by a common carrier. As the Court said in the J-T Transport case:

"* * * a finding by the Commission that existing common carrier service is 'adequate to meet the reasonable transportation needs' of the shipper fails to take into account that the new test under Section 203 (a) (15) is whether the service is 'designed to meet the *distinct need* of each individual customer.' While existing *specialized services* of common carriers may very well be adequate to supply the shipper's '*reasonable transportation needs*', that existing service may not in fact meet the *distinct* or *specific* need of the supporting shipper."

### V

The orders of the Interstate Commerce Commission dated June 30, 1959 and December 16, 1959 in proceeding number MC–117391 shall be set aside and their enforcement enjoined. The cause is remanded to the Interstate Commerce Commission for such further proceedings in conformity with this opinion as may be proper.