**MEAT PACKERS EXPRESS, INC.,**
Plaintiff,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Defendants,

**Midwest Coast Transport, Inc., and Colonial & Pacific Frigidways, Inc.,**
Intervening Defendants.

**Civ. 740L.**

United States District Court
D. Nebraska.

Aug. 3, 1965.

Richard A. Peterson, of Nelson, Harding & Acklie, Lincoln, Neb., for plaintiff.

Thomas H. Ploss, Atty., Dept. of Justice, Washington, D. C., for defendants United States and I. C. C.

Marshall D. Becker, Omaha, Neb., for intervening defendants, Midwest Coast Transport, Inc. and Colonial & Pacific Frigidways, Inc.

Before JOHNSEN, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

VAN PELT, District Judge.

Meat Packers Express, Inc. (plaintiff or Meat Packers) requested authority

from the Interstate Commerce Commission (Commission) to operate over irregular routes as a contract carrier in accordance with the provisions of Section 209 of the Interstate Commerce Act. (49 U.S.C. § 309). Meat Packers proposes to operate as a contract carrier for Farmbest, Inc. of Denison, Iowa (Farmbest), and in such capacity intends to transport by motor vehicle certain meat and dairy products from Denison, Iowa to points in California, Arizona, Nevada, Oregon and Washington. This three judge court was convened to consider plaintiff's action to enjoin, annul and set aside a report and order of the Commission entered September 25, 1963. In its order the Commission adopted the report and order of its examiner recommending the denial of the contract carrier authority requested by Meat Packers.

I

■ The court is initially confronted with a procedural question raised by intervenors. In its complaint the plaintiff alleges exhaustion of administrative remedies, and although admitted by the defendants United States and Interstate Commerce Commission the allegation is denied by the intervening defendants Midwest Coast Transport, Inc. (Midwest) and Colonial and Pacific Frigidways, Inc. (Colonial). These intervening defendants [1] take the position that plaintiff should have filed a petition under Section 1.101(a)(4) of the General Rules of Practice of the Commission [2] seeking a finding of an issue of general transportation importance and ultimately a rehearing before the Commission *en banc*. We disagree.

■ The record before this court is sufficient to entitle plaintiff to a review of the Commission's order, and additional efforts directed toward securing a rehearing before the entire Commission were unnecessary insofar as exhaustion of administrative remedies is concerned. Following the hearing examiner's report and recommended order wherein it was concluded that the granting of the authority sought by plaintiff would not be consistent with the public interest and the national transportation policy, exceptions thereto were filed on behalf of the plaintiff. On September 25, 1963 the Commission, Division 1, entered its order which affirmed and adopted the findings and conclusions of the examiner and denied the plaintiff's application. The proceeding before the Commission and its order were administratively final; no further action was required of plaintiff. Malone Freight Lines, Inc. v. United States, 204 F.Supp. 745 (N.D.Ala.1960); State of Arizona v. United States, 220 F.Supp. 337 (D.Ariz.1963).

II

As previously observed, the plaintiff seeks authority as a westbound contract carrier over irregular routes for Farm-

---

1. Although intervening defendants are limited to two in number, the following additional parties appeared as protestants before the Commission: Little Audrey's Transportation Company, Inc., Frozen Foods Express, Inc., Brady Motorfrate, Inc., Ringsby Truck Lines, Inc., Fortier Transportation Company, Converse Trucking Service, The Southern Pacific Company, Santa Fe Railway System, Chicago and Great Western Railway Company, Chicago, Milwaukee, St. Paul and Pacific R.R. Company, Rock Island and Pacific Railroad Company, Denver, Rio Grande & Western Railroad Company, Great Northern Railway Company, Union Pacific Railroad Company, Illinois Central Railroad Company, and Northern Pacific Railway Company.

2. Section 1.101(a) (4) provides *inter alia*:
 "In any proceeding which has involved the taking of evidence at oral hearing or by modified procedure in which the Commission has not noted the presence of an issue of general transportation importance, any party may, within 15 days after the service of a final decision, order, or requirement of a division or appellate division, as to which the filing of a petition for rehearing, reargument, or reconsideration is not permitted, file a petition requesting the Commission to find on its own motion that the proceeding is one involving an issue of general transportation importance."

best, Inc. of Denison, Iowa. Farmbest operates as a pork packer, shipping dressed carcass meat as well as offal and the resultant by-products of grease and lard from its Denison plant. The carcasses are shipped 80 to 90 per cent fresh, unfrozen, while the offal per cent is reversed and 90 per cent is shipped frozen. The evidence adduced before the examiner and set forth in his report indicates that at the time of the hearing [3] the Denison plant processed a total of over 100 million pounds of meat per year, approximately 40 per cent of which was transported to the western states here involved. And correlatively, the evidence further developed the fact that facilities at the Denison plant are being expanded which will in turn, of course, reflect an increase in total production.

The examiner upon a review of the evidence reached the conclusion that,

"[w]hile the definition of a 'contract carrier by motor vehicle' is one other than a common carrier, for furnishing transportation services through assignment of motor vehicles for a continuing period of time, for exclusive use of a shipper *or* for the furnishing of services designed to meet the distinct needs of the shipper, here the exclusive assignment is present. And while some services rendered may possibly be deemed for certain distinct needs, the examiner does not so find, as the needs here are those ordinarily met and served by common carriers."

This finding is attacked by plaintiff on two grounds. Initially it is asserted that the finding in regard to "distinct need" was an unnecessary prejudicial coloration of the Section 209(b) criteria since the plaintiff had already qualified as a contract carrier under the alternative disjunctive portion of Section 203(a)(15)(a) of the Act, i. e., engaged in the motor vehicle transportation under a continuing contract" for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served." It is also urged by plaintiff that the finding itself of no distinct need was erroneous and not supported by the evidence before the examiner and the Commission.

A review of the 1957 amendments to the contract carrier provisions to the Interstate Commerce Act, and specifically sections 203(a)(15) and 209(b) of the Act, is necessary as a background for the later comment herein. The history, both legislative and judicial, surrounding the enactment of these provisions has been the subject of considerable juridicial comment.[4]

Our starting point is the decision of the Supreme Court in United States v. Contract Steel Carriers, 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482 (1956), which was the acknowledged precipitant of the 1957 legislation. See Interstate Commerce Commission v. J–T Transport Co., Inc., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961); 1957 U.S. Code Cong. & Admin. News pp. 1599, 1601.[5] Fears were

---

3. The evidence in this matter was taken before the Commission's examiner in Kansas City, Missouri on December 17 and 18, 1962. The report and order recommended by the hearing examiner, A. Lane Cricher, was served April 25, 1963.

4. The legislative history of the 1957 amendments is comprehensively discussed by the Supreme Court in Interstate Commerce Commission v. J–T Transport Co., Inc., 368 U.S. 81, 82 S.Ct. 204 (1961). Consideration has been given the same in other lower court decisions. See e.g., National Trailer Convoy, Inc. v. United States, 227 F.Supp. 730 (N.D.Okla.1964); Reddish v. United States, 188 F.Supp. 160

(W.D.Ark.1960); J–T Transport Co., Inc. v. United States, 185 F.Supp. 838 (W.D.Mo.1960).

5. Therein the court stated:
"The aim of the 1957 amendments, as we read the legislative history, was not to protect the *status quo* of existing carriers but to establish a regime under which new contract carriage could be allowed if the 'distinct need' of shippers indicated that it was desirable." 368 U.S. at 89, 82 S.Ct. at 209.

\* \* \* \* \*

"The proper procedure, we conclude, is for the applicant first to demonstrate that the undertaking it proposes is

expressed that the effect of the decision would be the destruction of any existing distinction between contract and common carriers, and in order to avoid a situation whereby the line of demarcation between the two types of motor carrier service would be vanquished, legislation was proposed by the Commission. The original legislation would have changed the definition of a contract carrier to one who engages in transportation by motor vehicle

> "* * * under continuing contracts with one person or a limited number of persons for the furnishing of transportation services of a special and individual nature required by the customer and not provided by common carriers."

At the same time, presumably intended as a supplement to the proposed definition, a bill was introduced which would have amended § 209(b) by the inclusion of a provision that a permit would issue when it appeared, inter alia, "that existing common carriers are unwilling or unable to provide the type of service for which a need has been shown."

The dual requirement that the proposed contract carriage service be of a special nature not provided by common carriers and that a showing be made that existing common carriers are unwilling or unable to provide the service was vigorously opposed.

> specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have the ability as well as the willingness to meet that specialized need. If that is done, then the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants.
> "Moreover, as we read the Act, as amended in 1957, the standard is not whether existing services are 'reasonably adequate.' It is whether a shipper has a 'distinct need' for a different or a more select or a more specialized service. The protesting carriers must show they can fill that 'distinct need,' not that they can provide a 'reasonably adequate service.'" 368 U.S. at 90–91, 82 S.Ct. at 210.

"Opposition to the definition centered largely on the claimed difficulty of administration and on the belief that it might destroy contract carriage as presently conducted. It was pointed out that many contract carriers have only one contract, that sometimes they perform a service similar to common carriage, and that a definition excluding such transportation would exclude these carriers or possibly force them to seek common carrier certificates." 1957 U.S. Code Cong. & Admin. News 1599, p. 1602.

The initial proposed amendments were ultimately abandoned in favor of the existing legislation, and in fact the Commission changed its position by recommending that the words "and not provided by common carriers" be deleted from the definition clause, noting that "[t]hese words are not necessary to carry out the purpose of the bill. * * *"

The resulting amended definition of contract carrier, which constitutes the present statutory language and is governing herein, reads as follows:

> "The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14)

> Significantly, however, the J–T case concerned contract carriers who had qualified as such pursuant to § 203(a) (15) (b), which is the distinct need alternative. Certain language of the Court would indicate its recognition of this as well as its intention to limit the scope of the decision to those applicants seeking to qualify under the "distinct need" alternative. The Court prefaced its discussion containing the above quoted language when it observed "Section 203(a) (15), however, was amended, *so far as material here*, by adding to the description of the term 'contract carrier by motor vehicle' one who furnishes 'transportation services designed to meet the distinct need of each individual customer.'" 368 U.S. at 87, 82 S.Ct. at 208 (Emphasis added).

of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer." 49 U. S.C. § 303(a)(15).

In the same legislation § 209(b) of the Act [49 U.S.C. § 309(b)], which is basically the provision setting forth the terms and conditions under which a contract carrier permit will be issued, was amended by inclusion of the following determinative considerations:

> "In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider (1) the number of shippers to be served by the applicant, (2) the nature of the service proposed, (3) the effect which granting the permit would have upon the services of the protesting carriers and (4) the effect which denying the permit would have upon the applicant and/or its shipper and (5) the changing character of that shipper's requirements." [Numerals added by Supreme Court in Interstate Commerce Commission v. J–T Transport Co., 368 U.S. 81, 82 S.Ct. 204 (1961)].

 Hence, to qualify as a contract carrier the applicant must satisfy the fundamental test of transportation "under continuing contracts with one person or a limited number of persons." All contract carriers must conform to this test. The remaining two criteria are stated in the disjunctive, thus once the basic test is met the applicant qualifies if he either (1) assigns vehicles for a continuing period of time to the exclusive use of each contract shipper, or (2) furnishes transportation services designed to meet the distinct need of each individ-

ual shipper. As herein noted, the Commission recognized that plaintiff qualified as a contract carrier by satisfying the basic test and alternative one (1) above.

 It is thus clear that there was no burden of proof upon applicant to show "distinct need" under the section defining contract carrier, since it qualifies under the other alternative.

 It is necessary, however, for the Commission to determine whether under § 209(b) the issuance of the permit will be "consistent with the public interest and the national transportation policy declared in this Act."

 It is at this point that we feel that the Commission has not properly evaluated the five criteria set forth in § 209(b), due perhaps, as applicant contends, to a confusing of distinct need under § 203(a) (15) with the determination to be made under § 209(b). They are not the same and the term "distinct need" in § 203(a)(15) cannot be used interchangeably with the determination quoted above to be made under § 209(b).

We have set forth the history above because we feel that the Commission in making its evaluation has adopted too narrow a basis and if we were to approve its action in this regard, Farmbest and others similarly situated would be limited to common carriers alone for their transportation. Such was not the intent of the Congress.

We next consider the Commission's ruling and its evaluation of the five criteria in the determination of whether issuance is "consistent with the public interest and the national transportation policy."

 As to the criterion "(1) the number of shippers to be served by the applicant", the Commission's discussion was limited to a cryptic parenthetical "here applicant qualifies with one." This brevity obscures the weight the Commission gave to this factor. Therefore, our comment may be uncalled for. Yet if in the ultimate decision of the Commission this criterion was used against applicant we would remind all parties

that one of the militating factors in the 1957 contract carrier legislation was the desire to avoid the result of United States v. Contract Steel Carriers, supra, which seemingly allowed a carrier to qualify as a contract carrier for an unlimited number of shippers. We concur in the observations of the Commission in William P. Bursch Extension—Lumber, 91 M.C. C. 953, 15 F.C.C. Par. 35,569 (1963):

> "As we interpret the first criterion of section 209(b), it means that the applicant's case is stronger or weaker in proportion to the number of its contracting shippers. If the number of shippers already served approaches the maximum number permitted, the applicant, even though qualifying as a contract carrier, cannot be considered to have made any significant showing under this test. * * * In the instant proceeding, however, applicant now serves only one shipper and seeks to serve no other shipper. It would be impossible to make any stronger showing under the test involved."

In discussing "(2) the nature of the service proposed," certain additional facts should be mentioned.

It was clear to the examiner that pork must be shipped immediately after the kill. He said: "It is imperative that the meats be shipped shortly after the kill."

██ The hauls involved were from Denison, Iowa to the west coast. There is evidence in the record which would support a finding that applicant will supply this service in approximately 48 hours. The next fastest truck service takes approximately 66 hours. Railroad service takes over 72 hours.

Farmbest has a need for a split or drop off service and has had as many as four drop offs a trip. The common carriers proposed a flat charge for each such stop. The charge is $12.56 per stop.

██ In considering this service we find it difficult to disassociate the saving of as much as $50 on one trip where there are four drop offs through elimination of the "drop off" charge if the instant application is approved from what in the J–T case, supra, was termed "the length of its purse." In this connection it is well to note the language used by Judge Young in Reddish v. United States, 188 F.Supp. 160 (N.D.Ark.1960), aff'd 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961):

> "* * * [W]here the lower rates result from economies and advantages inherent in contract carrier operation, * * * and there is a showing that efficient business operation requires the proposed tailored service—including the lower rates, * * * the Commission may not disregard this evidence in its evaluation of the effect of a denial of the permit upon the applicant's supporting shippers. Mere cost-cutting or profit-shaving need not be considered perhaps, but evidence of efficient operation must be heeded."[6] 188 F. Supp. at 167.

6. In affirming the Supreme Court stated: "We think the matter of rates is one factor to be weighed in determining the need for the new service. In a contest between carriers by motor vehicles and carriers by rail, we held in Schaffer Transportation Co. v. United States, 355 U.S. 83 [78 S.Ct. 173, 2 L.Ed.2d 117], that the ability of a particular mode of transportation to operate with a lower rate is one of the 'inherent advantages' that one type may have over another within the meaning of the Act. 54 Stat. 899 [49 U.S.C.A. note preceding section 1]. By analogy, contract carriage may be more 'economical' than common carriage by motor or rail within the framework of the national transportation policy, as it is defined in the Act—'the Commission's guide' to the public interest. * * * It would seem hardly contestable that if denial of the application meant, for example, that a shipper's costs of transportation would be prohibitive, the shipper had established a 'need' for the more 'economical' service. * * * This does not mean that the lawfulness of rates would be injected into certificate proceedings. The issue of whether or not the proposed service offers a rate advantage and if so whether such advantage establishes a 'need' for the service that

Advertising by Farmbest on the trailers was urged in support of the application. In a highly competitive industry such as meat packing we cannot say that such a benefit to Farmbest is "inconsequential" in evaluating applicant's case.

Applicant will station trailers at Denison, to be immediately available. While common carriers indicate a willingness to station equipment at Denison, there is testimony that the units would be sent from Omaha, 70 miles away, on a regularly scheduled run. Thus it would not be as convenient a service for Farmbest as Meat Packers Express will furnish.

There is reason to believe from the conclusion reached by the Commission that applicant is correct when it urges that on other occasions the Commission has given weight to factors to which it did not give weight here.

In Shaw v. Bogan Contract Carrier Application, 72 M.C.C. 275, it is stated:

"The numerous pickups and deliveries involved in such movements, the small size of the individual shipments, the limited number of shippers that would be served, the need for refrigerated vehicles and fast transportation are all factors indicative of the specialized nature of the proposed service. We conclude that such service would be that of a contract carrier and that applicants are ready and able to render this type of service." 72 M.C.C. 275, 278

and in No. MC 114789 (Sub No. 3) Nationwide Carriers, Inc., Extension—Cheese, reported at 15 Federal Carriers Cases, 35,583, Division 1 of the Commission stated:

"Applicant's proposal to provide a service which insures multiple pickups keyed to numerous manufacturers production patterns, in response to fluctuating purchase requirement of shipper's customers can, we conclude, properly be described as one designed to meet shipper's particular

and distinct needs; and, consequently, is that of a contract carrier by motor vehicle as defined in Sec. 203 (a)(15) of the Act."

*Effect of grant on protesting carriers.* The Commission concluded that to grant the proposed permit to plaintiff would have a resultant adverse effect on the competing common carriers. This conclusion was premised on findings that (1) the protesting carriers would suffer competitively on eastbound trips, and (2) the protesting common carriers would lose the potential of increased westbound business. It is apparently conceded by all concerned that the protesting carriers would not lose this particular westbound tonnage if the permit were granted for they have not heretofore carried this particular cargo for Farmbest.

We feel constrained to express our disapproval of the above finding. In Interstate Commerce Commission v. J–T Transport Co. Inc., supra, the court discussed the application of criterion three to a situation where the protesting carriers were not handling the cargo desired to be shipped on a contract basis. It was pointed out,

"The fact that the protesting carriers do not presently perform the service being tendered and that the grant of the application would not divert business from them does not necessarily mean that the grant would have no effect 'upon the services' of the protesting carriers within the meaning of § 209(b). But where the protesting carriers do not presently have the business, it would seem that the grant of it to a newcomer would have an adverse effect on them only in the unusual case." 368 U.S. at 93, 82 S.Ct. at 211.

The conclusion of the examiner, adopted by the Commission, that the "common carriers * * * lose this potential of increased westbound business" is wholly unsupported by the evidence, and in fact was reached in the face of a prior finding

overrides counterbalancing considerations presents issues that fall far short

of a rate proceeding." 368 U.S. at 91–92, 82 S.Ct. at 210–211.

that "protesting carriers would not lose this particular westbound tonnage they have not heretofore carried."

 The other aspect of this criterion is the Commission's finding that the protesting carriers would suffer competitively insofar as eastbound or return trips are concerned. While we cannot agree with plaintiff that the only relevant inquiry is the subject traffic and that no consideration can be given to the adverse effect in the form of added backhaul competition (in this case eastbound hauls), we think the record is devoid of substantial evidence in support of this finding. Although the Commission indulged in no presumption of adverse effect, the result of its finding on the basis of the record was tantamount. Plaintiff's proposed eastbound backhauls consist of exempt commodities which it will carry for C. H. Robinson Company, a fresh fruit and vegetable broker in the midwest area operating out of Omaha, Nebraska. It is significant that the proposed backhaul carriage is limited to exempt commodities whereas the protestants make use of both regulated and exempt commodities on their eastbound return hauls. While there is evidence to the effect that one protestant presently hauls for C. H. Robinson Company on a regular basis and that additional eastbound competition in exempt commodity hauls was not needed, the evidence is lacking in substantiality to support the conclusion that there would be an adverse effect on the competing common carriers.

 Under the J–T decision it is only in the "unusual case" where a new contract authority will adversely affect protesting carriers not presently hauling the subject commodity. Although such an unusual case may encompass the situation where the added backhaul competition has the adverse effect, it is not shown by the evidence here. When the alleged adverse effect is on traffic other than that proposed, a greater showing must be made by protestants than might ordinarily suffice. And this would be particularly true when, like here, the

backhaul traffic of the plaintiff is limited to exempt commodities while the protestants have authority to transport regulated commodities, using exempts as fillers.

Further comment herein on criteria 4 and 5 is unnecessary.

We do feel it is instructive at this point to quote language appearing in the joint brief of the United States of America and Interstate Commerce Commission:

"For it is 'the distinct need of each individual customer' that the contract carrier is designed to fill. § 203(a)(15). * * * Hence the adequacy of existing services for normal needs and the willingness and ability of an existing carrier to render the service are not the end of the matter. The 'distinct need' of the shipper may nonetheless not be served by existing services, if the new service is better tailored to fit the special requirements of a shipper's business, the length of its purse, or the select nature of the delivery service that is desired."

While as we have pointed out, the finding of "distinct need" is unnecessary in this case, if the service of Meat Packers Express is better tailored to fit the special requirements of Farmbest business, the length of its purse or the select nature of the delivery service that is desired, then even if distinct need was to be proven, applicant's case would require a review by the Commission of its findings.

We conclude that the Commission has not properly applied the statutory law in this case and that the effect of its decision is to place upon applicant a burden of proof greater than was required.

 Although we are urged to remand with directions to grant the application, we feel that it is better for the Commission to make its own re-evaluation in the light of this opinion and give, in its determination of "consistent with public interest", such weight to the cri-

teria as under the facts of this case and the legislative history herein outlined they are entitled.

Accordingly, judgment will be entered setting aside the order of the Interstate Commerce Commission and remanding the case thereto for further proceedings consistent with this opinion.