239 So.2d 753

**ALABAMA PUBLIC SERVICE COM-
MISSION et al.**

v.

**CONSOLIDATED TRANSPORT CO., Inc.**

**8 Div. 355.**

Supreme Court of Alabama.

Sept. 24, 1970.

MacDonald Gallion, Atty. Gen. and Robert P. Bradley, Asst. Atty. Gen., for The Public Service Commission.

J. Douglas Harris, Montgomery, for Redwing Carriers, Inc.

**324**

Cloud, Berry, Ables, Blanton & Tatum, Huntsville, for appellee.

LAWSON, Justice.

Under the provisions of the Alabama Motor Carrier Act of 1939 (Act 669, approved July 5, 1940, General Acts 1939, p. 1064), as amended, 1958 Recompiled Code of Alabama, Title 48, §§ 301(1)–301(51), Consolidated Transport Company, Inc., a corporation, hereinafter referred to as Consolidated, filed an application with the Alabama Public Service Commission, hereinafter referred to as the Commission, seeking a permit to operate as a contract carrier, by motor vehicle, in the transportation of cement, in bulk, in intrastate commerce, over irregular routes to all points and places within a radius of one hundred twenty-five miles of Decatur, Alabama.

Baggett Transportation Company, Phelps Trucking, Inc., Schwerman Trucking Company, Miller Transporters, Inc., and Redwing Carriers, Inc., all common carriers, with the possible exception of Schwerman, gave notice of protest to the granting of Consolidated's original application. Schwerman, at the time, may have been operating in Alabama only as a contract carrier. The record is not clear as to its status.

Baggett and Phelps withdrew their protests after Consolidated's application was amended by striking therefrom the words "irregular routes to all points and places within a radius of 125 miles of Dacatur, Alabama," and by substituting in lieu of those words the following: "To transport cement in bulk for the account of Missouri Portland Cement Company, a corporation, from the plant site or sites of Missouri Portland Cement Company in Decatur, Alabama, to any and all places within the State of Alabama."

Consolidated's application, as amended, was denied by the Commission. Consolidated thereupon appealed to the Circuit Court of Madison County, in Equity, the county of its residence, under the provisions of § 301(27), Title 48, 1958 Recompiled Code of Alabama. We recognize the fact that the 1958 Code is not an official Code, but for convenience we cite the appropriate sections of Title 48 of that Code rather than the appropriate sections of the Alabama Motor Carrier Act of 1939, *supra,* the provisions of which are not included in the 1940 Official Code of Alabama.

The Circuit Court of Madison County, in Equity, set aside the order of the Commission and remanded the cause to the Commission with directions to issue a permit to Consolidated as applied for in its application, as amended.

As authorized by § 301(27), Title 48, *supra,* and § 90, Title 48, Code 1940, the Commission and Redwing (§ 80, Title 48, Code 1940) perfected an appeal to this court from the decree of the Circuit Court of Madison County, in Equity.

The Commission's order under date of July 29, 1968, in pertinent part reads:

"Upon consideration of the testimony offered by the parties, and upon full consideration of the entire record in this proceeding, the Commission is of the opinion and finds that the proposed service would not be consistent with the public interest and that the application

in this proceeding should therefore be denied.

"IT IS THEREFORE ORDERED BY THE COMMISSION, That the application in this proceeding be, and the same is hereby, denied."

In the court below the proceedings were controlled by § 82, Title 48, 1958 Recompiled Code, which section provides that the Commission's order shall be taken as prima facie just and reasonable; that no new or additional evidence may be introduced in the circuit court, with an exception not here pertinent; that the circuit court shall hear the case (appeal) upon the certified record "and shall set aside the order [of the Commission] if the court finds that: the commission erred to the prejudice of appellant's substantial rights in its application of the law; or, the order, decision or award was procured by fraud or was based upon a finding of facts contrary to the substantial weight of the evidence. * * *"

■ We must review the decree of the trial court without any presumption of its correctness. We are governed by the same rules in our review as was the circuit court, so we will review the order of the Commission as though the appeal from the Commission's order had been taken directly and primarily to this court.—Alabama Public Service Commission v. Nunis, 252 Ala. 30, 39 So.2d 409; Alabama Public Service Commission v. Higginbotham, 256 Ala. 621, 56 So.2d 401; Alabama Public Service Commission v. Decatur Transfer & Storage, Inc., 257 Ala. 346, 58 So.2d 887; Alabama Public Service Commission v. Redwing Carriers, Inc., 279 Ala. 659, 189 So.2d 342.

The standards which govern the Commission in a case of this kind, involving an application for a permit to operate as a *contract* carrier, have been said to be (1) that the applicant is fit, willing and able to properly perform the service of a contract carrier by motor vehicle and to conform to the provisions of the statute and.

the lawful requirements, rules and regulations of the Commission thereunder; and (2) that the proposed operation to the extent authorized by the permit will be consistent with the public interest. Otherwise the application should be denied.— Alabama Public Service Commission v. Nunis, *supra*; Alabama Public Service Commission v. Decatur Transfer & Storage, Inc., *supra*; § 301(11), Title 48, 1958 Recompiled Code of Alabama. In fact, the section last cited reads, in part, as follows:

"*  *  *  Subject to section 301(12) of this title, a permit *shall be issued* to any qualified applicant therefor, authorizing in whole or in part the operations covered by the application, if, after public hearing of the application, it appears from the application and the evidence in support thereof or from any hearing held thereon that the applicant is fit, willing and able to properly perform the service of a contract carrier by motor vehicle and to conform to the provisions of this article and the lawful requirements, rules and regulations of the commission thereunder, and that the proposed operation, to the extent authorized by the permit will be consistent with the public interest, otherwise such application shall be denied.  *  *  *" (Emphasis supplied)

The order of the Commission set out above shows on its face that the Commission denied Consolidated's application, as amended, on the ground that the service which Consolidated proposed to render "would not be consistent with the public interest." It follows that the Commission did not base its denial of Consolidated's application, as amended, on the ground that Consolidated was not fit, willing and able to properly perform the service of a contract carrier by motor vehicle, etc. See Alabama Public Service Commission v. Nunis, *supra*.

In the order here under review, the Commission merely expressed the opinion and found "*  *  *  that the proposed service

would not be consistent with the public interest  *  *  *," and therefore ordered that the application be denied. The language last quoted above, though not a finding of fact, constitutes an application of the law to the facts. Alabama Electric Cooperative Inc., v. Alabama Power Co., 274 Ala. 332, 148 So.2d 613.

As observed in the *Higginbotham* case, *supra*, since there is no finding of facts by the Commission, in considering whether the Commission erred in applying the law to the facts we must consider the evidence in the light most favorable to upholding the order of the Commission and without weighing the conflicting evidence. In other words, we do not weigh the conflicts in the evidence, but accept as true those tendencies of the evidence and reasonable inferences to be drawn therefrom which tend to support the action taken by the Commission. See Alabama Electric Cooperative, Inc., v. Alabama Power Co., *supra*.

With these rules in mind, we summarize the evidence in the light most favorable to the action taken by the Commission.

Missouri Portland Cement Company, hereinafter referred to as Missouri Portland, is a Missouri corporation with headquarters in St. Louis, Missouri. It began operating in Alabama in May, 1964, out of its bulk silo storage facilities in Decatur, which consists primarily of three silos, each of which has a nine-thousand-barrel capacity. Cement is shipped to Decatur by barge and then stored in a silo.

Missouri Portland's business in Decatur consists of selling bulk cement to certain customers in North Alabama, which consist of three types of "dealers," namely, ready mix dealers, concrete pipe and block dealers, and concrete products dealers. The latter apparently build or manufacture concrete septic tanks and concrete vaults. Missouri Portland's customers or dealers have limited storage facilities for cement,

consequently they require prompt and immediate delivery because of the nature of their businesses. Delivery has to be made in a specially designed tractor-trailer, which we will sometimes refer to hereinafter as a truck.

Missouri Portland did not own any such truck, so it usually used Baggett Bulk Transport, a common carrier, to transport the cement which had been ordered by the dealers. Baggett had the required trucks. Missouri Portland found Baggett's service unsatisfactory, even though Baggett, whose terminal is in Birmingham, usually kept one truck at Missouri Portland's plant in Decatur from April of 1966 until April of 1968. The truck so stationed was not sufficient to meet the demands of Missouri Portland's plant. When Baggett was called upon to furnish additional trucks from its terminal in Birmingham, the trucks frequently arrived at Missouri Portland's plant in Decatur too late to make delivery and as a result Missouri Portland lost customers.

Prior to April of 1968 the only carrier, other than Baggett, which Missouri Portland contacted for service was Schwerman, which was not authorized by the Commission to haul cement from Missouri Portland's Decatur plant. The calls to Schwerman in Birmingham were made by the terminal clerk of Missouri Portland's Decatur operation upon instruction from his superior in St. Louis who, like the terminal clerk, was unaware of the fact that Schwerman was without authority to service Missouri Portland's Decatur facility.

On one occasion when Missouri Portland called Schwerman for service, Schwerman contacted Herrin-Miller Transporters, Inc., the previous corporate name of Miller Transporters, Inc., which dispatched to Missouri Portland's plant in Decatur a truck which it had leased from Schwerman. The truck was apparently leased simply for the "trip." Two loads of cement were shipped by Missouri Portland in that truck on the same day.

Although the evidence was in conflict on the point, the Commission was justified in finding therefrom that prior to April of 1968, Redwing and Miller Transporters, Inc., had solicited business from Missouri Portland, but without success.

Although it had not expressed to the Commission its dissatisfaction with Baggett nor accepted the services of Redwing or Miller, nor made any investigation as to whether the services of any other common carrier were available to it, Missouri Portland early in 1968 decided to try to arrange for its cement to be delivered to its customers by a contract carrier.

Mr. Lee Matthews, of St. Louis, Missouri, general traffic manager of Missouri Portland, discussed the transportation problems of his company's Decatur plant with Mr. Gordon Mitchell, a businessman of Huntsville, Alabama.

Shortly thereafter, on March 28, 1968, Consolidated was formed for the purpose of supplying "equipment" to Missouri Portland in Decatur. Mr. Mitchell is the principal stockholder of Consolidated and its president. No person connected with Consolidated has any connection with Missouri Portland or any of its affiliated companies, financial or otherwise. Missouri Portland nor any of its affiliated companies gave Consolidated any financial aid.

Consolidated purchased three new 1968 Mac diesel tractors and three new Fruehauf trailers, which are specially designed and equipped for the hauling of cement in bulk. Those purchases were financed by a bank loan and were made "with the plan in mind to file application before the Public Service Commission for the rights of the contract carrier solely with Missouri Portland's plant in Decatur."

We will sometimes hereinafter refer to the Mac tractors and the Fruehauf trailers as Consolidated's trucks.

On April 1, 1968, Consolidated, as the first party, and Missouri Portland, as the second party, entered into a written con-

tract which contained the following provisions:

"-1-

"Whereas the first party desires to transport porperty from the plant of the second party by motor vehicle, and is equipped with motor trucks and other necessary equipment which it proposes to dedicate to the exclusive use of the transportation of cement in bulk in tank vehicles, from the plant, of the second party, located at Decatur, Alabama, to destinations within the state of Alabama as selected by the second party;

-2-

"Whereas second party desires to procure the services of the first party for said transportation from and after a starting date yet to be determined and agrees to tender the first party a minimum of 30,000 barrels per annum for each 12 months of transportation of shipments thereunder;

-3-

"Now, therefore, the first party hereby guarantees to furnish prompt and efficient service and assumes all the liability and responsibility of an independent contractor in the performance of the transportation above provided, upon the terms and conditions herein contained and the rates and charges shown in Appendix 'A', hereto attached and made a part hereof, and such other charges covering services, known in the cement industry as accessorial services, that will be competitive with any legitimate carrier operating in the same general area."

The contract further provided that if Consolidated's services became inadequate, without proper cause, Missouri Portland could enter into other agreements for the performance of the services described in the contract; that Consolidated furnish all of its trucks and that all persons required to perform the services which Consolidated agreed to perform are to be employees of Consolidated, who is to be an independent contractor, not an employee of Missouri Portland; that Consolidated is not to enter into any other transportation agreement with a third party without the expressed written consent of Missouri Portland for the duration of the contract.

The contract contains language which shows, we think, that the parties thereto recognized that it was inoperative unless the Commission granted to Consolidated a permit to operate as a contract carrier to haul Missouri Portland's cement.

Although the written contract does not expressly so provide, testimony adduced before the Commission shows that if Consolidated's application, as amended, was granted, it would station its three trucks on the property of Missouri Portland in Decatur, where they would be available to Missouri Portland at all times. Consolidated would compensate Missouri Portland for that privilege if compensation was requested.

Consolidated filed its original application for a permit to operate as a contract carrier on April 12, 1968.

On April 15, 1968, Consolidated entered into a lease arrangement with Missouri Portland for the lease of its three trucks pending action by the Commission on Consolidated's application. The drivers of the trucks were employees of Consolidated, but the trucks were stationed at Missouri Portland's Decatur facility. Under this arrangement Missouri Portland was able to deliver cement to its customers without delay. During the two-month period which intervened between the date of the lease agreement and the date of the hearing before the Commission, Missouri Portland's business increased eighteen per cent.

An official of Missouri Portland clearly indicated that his company would much prefer to use Consolidated as a contract carrier than to use a common carrier whose trucks were stationed in Birmingham and indicated that while Missouri Portland did not want to be in the carrier business, as it

was under the lease arrangement, that such an arrangement was preferable to service of the kind that company had received from common carriers. The official did concede, although reluctantly, that if Consolidated's application, as amended, was denied, Missouri Portland would use the services of common carriers "if we actually received a guarantee that service would be comparable to what we have now, and would be escalated." But that official stated that Missouri Portland would not put itself in a position of being a secondary shipper of any common carrier.

Redwing, one of the protestants, a common carrier, has the authority to transport cement in bulk from Missouri Portland's plant site in Decatur to other points in Alabama and it has eighteen trucks registered in Alabama of the type needed to transport cement in bulk. If the "traffic" merited it, Redwing would station at least three such trucks in Decatur to service Missouri Portland. Redwing is willing to and will give Missouri Portland the service it needs, according to the testimony of an official or employee of Redwing.

Miller Transporters, another protestant, a common carrier, under the authority which it holds and with its leased trucks, could take care of Missouri Portland's transportation needs and would station "equipment in the Decatur vicinity" if there was a demand for such service and "if anything like an attractive arrangement like the one offered to the applicant here [Consolidated] were offered to Miller."

As we have therefore indicated, Schwerman did not have authority from the Commission to transport cement in bulk from Missouri Portland's plant site in Decatur to other points in Alabama. According to the testimony of the traffic supervisor of Schwerman's southern division, Schwerman at the time of the hearing before the Commission was operating in Alabama as a contract carrier but had pending before the Commission an application for the

transfer to it of "the lime and cement authority" held by Miller Transporters.

That witness, when asked what would be Schwerman's position relative to furnishing service to Missouri Portland if it received Miller Transporters "lime and cement authority," answered, "It would be the purpose of Schwerman Trucking Company to provide the same type or similar service that we afford all of our shippers throughout the country. That is, if the volume will warrant the placement of equipment at any assigned location, this we do. If the volume is not such that would afford the placing of equipment adjacent to the shipper's property, of course, we give them reasonable service on dispatching. We maintain twenty-four hour a day dispatch through our system. And on reasonable notice we can furnish equipment any place."

Later on in his testimony, Schwerman's traffic supervisor gave an affirmative answer to the following question propounded to him by counsel for Schwerman: "* * Well, if this particular shipper, Missouri Portland Cement Company, offered to guarantee you a minimum of 240 truck loads of cement from Decatur, Alabama, to be transported in intrastate commerce from Decatur, would Schwerman, as a result of such guarantee, enter into an arrangement whereby Schwerman would exclusively dedicate equipment, three pieces or more to this particular shipper at Decatur?" We think it clear that the affirmative answer was based, in part, on a matter not included in the question, the transfer to Schwerman of the authority of Miller Transporters to haul lime and cement in bulk as a common carrier.

The question arises, Why did the Commission conclude from the facts summarized above that "the proposed service [the service proposed by Consolidated in its application, as amended] would not be consistent with the public interest"? As shown above, it was on that conclusion that the Commission based its order denying Consolidated's application, as amended.

The answer is not found in the Commission's order, but we think it clear that the answer to the question is that the Commission entertained the view that it would not be consistent with the public interest to grant Consolidated's application, as amended, because Redwing and either Miller Transporters or Schwerman would afford Missouri Portland all of the service it required, and that it would be injurious to those carriers and consequently the public would suffer if those carriers did not get Missouri Portland's business.

The Commission's order was rendered on July 29, 1968. At that time this court had written opinions in two cases which had some bearing on the question before the Commission.

In Alabama Public Service Commission v. Nunis, 252 Ala. 30, 39 So.2d 409, the Commission refused to issue a permit to Nunis to operate as a common carrier. Nunis appealed to the Circuit Court of Jefferson County, where the order of the Commission was reversed. The Commission appealed to this court and an intervenor, J. Owen Robins, doing business as a common carrier under the name of Robins Transfer Company, joined in the assignments of error. We affirmed the judgment of the circuit court.

In *Nunis* the Commission determined that there were sufficient carriers qualified with it to transfer the petroleum products as outlined in Nunis' application, "and that the issuance of another permit would not be consistent with the public interest."

Since the opinion in the *Nunis case* was the first opinion written by this court which takes cognizance of the difference between the phrase "consistent with the public interest" (contract carriers) and the phrase "certificate of public convenience and necessity," (common carriers), we quote at length from that opinion:

"The phrase 'consistent with the public interest' is therefore the controlling factor in our inquiry. This involves a quasi legislative as well as quasi judicial function by the commission, a body of experts, whose business calls for such decisions in its ordinary course. Alabama Public Service Comm. v. Crow, 247 Ala. 120, 22 So.2d 721; North Alabama Motor Express v. Rookis, [244 Ala. 137, 12 So.2d 183] supra.

"Attention is called to the difference in the finding necessary for contract carriers, that is, 'consistent with the public interest,' and for common carriers, that there must be a 'certificate of public convenience and necessity'. Section 301(8), Title 48, supra.

"*A contract carrier can give preferential service, and is not limited to schedules or routes: a common carrier is thus bound.* The service here proposed to be rendered by appellee is based on a rate nearly twice as much as that fixed for common carriers. The United States Government is the proposed customer at that rate. There is only one common carrier, the intervenor in this proceeding, J. Owen Robins, who has such a certificate of convenience and necessity, and who at present may be in position to carry such products in bulk between the designated termini, when consistent with his obligations as a common carrier. He has not done so in the past nor solicited such business. *This carrier cannot extend the preferential service nor other advantages of a contract carrier.*

"There is no evidence to show that the performance of the service by Robins will satisfy the needs of the proposed customer of appellee, Nunis. Robins has not been carrying such products for this customer. Nunis had done so as feature of interstate shipments, and has an interstate permit. But the customer's business here involved is on an intrastate status, requiring a permit now applied for. The granting of such permit will not disrupt existing business, nor will it result in unfair or destructive practices. It will in substance enable this appellee to extend an existing service to that which has a different technical status. The fact that the proposed business of appellee does not extend rights to the

general public does not prove that its operation is inconsistent with the public interest. It is not a question of whether the public needs this service, as when a common carrier seeks a permit, but whether such service would be detrimental to the public interest. It is said to be a form of private transportation. It may be noted that the public has the benefit of such service by Robins, the common carrier. But no use by the public has been made of it. It does not appear that this proposed service will tend to prevent Robins from being able to render adequate service of that sort, or any sort, to the public, or in any manner disrupt his business.

"The commission seemed to base its conclusion that the issuance of the permit to the limited extent here sought, would not be consistent with the public interest upon a further finding that there are sufficient existing carriers qualified with the commission to transport the petroleum products in bulk, as outlined in this application.

"We think the commission failed to distinguish between the phrase 'consistent with the public interest' and 'public convenience and necessity.' There was no other contract carrier thus licensed, or seeking a permit in respect to the business here involved. We think this proposed service would be consistent with the public interest, unless it would probably depreciate materially the ability of the lone common carrier who may be equipped so to engage in serving the public, and who alone is protesting this application. It is not here a question of making a finding upon conflicting evidence, but of applying the undisputed facts to the legal principles which are controlling. A finding of facts is a different concept from the judicial function of applying the law to those facts. When the commission determined that the facts as found showed that the proposed permit would not be consistent with the public interest it was applying the law to the facts, and not making a finding of facts.

"We do not think that the facts as found in connection with the evidence in the case, or considered independently of the finding, are sufficient to justify the quasi judicial conclusion that the permit would not be consistent with the public interest." (Emphasis supplied) (252 Ala., 35–56, 39 So.2d, 413–414)

In Alabama Public Service Commission v. Decatur Transfer & Storage, Inc., 257 Ala. 346, 58 So.2d 887, we followed *Nunis* in affirming the judgment of the circuit court which reversed an order of the Commission denying to Decatur Transfer & Storage a permit to operate as a contract carrier because existing service in the territory covered in the application was adequate "to meet the reasonable public needs" and because "protestants have sought the traffic covered in this application." In the case last referred to we said: "Here, as in the Nunis case [252 Ala. 30, 39 Sc.2d 413], we think the Commission failed to distinguish between the phrase 'consistent with the public interest' and 'public convenience and necessity.' "

In *Nunis* and in *Decatur Transfer & Storage* there was only one common carrier which protested the granting of the permit. In this case there were two protestants, Redwing and either Miller Transporters or Schwerman, who wanted to render service to Missouri Portland. The protestants in this case testified that they had sought the business of Missouri Portland but so had the protestant in Decatur Transfer & Storage. The protestants in this case say that they would station three trucks in Decatur for Missouri Portland's use, one of them saying expressly that the trucks would be for the exclusive use of Missouri Portland, and from the testimony adduced on behalf of the other two protestants it is clear that such exclusive use was to be inferred. But these protestants are common carriers, that is, Redwing and Miller Transporters are common carriers, and if Schwerman comes into the picture it will be as a common carrier, in which event Miller Transporters would go out of the picture.

But a common carrier cannot extend the preferential service or other advantages of a contract carrier. Alabama Public Service Commission v. Nunis, *supra.* § 301(12), Title 48, 1958 Recompiled Code, reads:

"No person after the effective date of this article shall at the same time hold under this article a certificate as a common carrier and a permit as a contract carrier authorizing operation for the transportation of property by motor vehicle over the same route or within the same territory, unless for good cause shown the commission shall find that such certificate and permit may be held consistently with the public interest."

In so far as we are advised, the Commission has not held that it would be consistent with the public interest for any of the protestants to operate as a contract carrier as well as a common carrier. The Commission should not sanction by indirection that which it cannot grant directly.

There was no evidence even remotely tending to show that the granting of a permit to Consolidated would probably depreciate materially the ability of the protestants to serve the public. Alabama Public Service Commission v. Nunis, *supra.*

So if our action here was based only on the application of the rules enunciated in *Nunis* and *Decatur Transfer & Storage* to the facts of this case, we would unhesitatingly affirm the judgment of the Circuit Court of Madison County.

But we must consider our recent case of Osborne Truck Lines, Inc., v. Alabama Public Service Commission et al., 284 Ala. 166, 223 So.2d 284 (April 10, 1969, rehearing denied, June 12, 1969).

In that case the Commission issued a permit to E. E. Carroll, d/b/a Carroll Trucking Company, to operate as a common carrier. The Circuit Court of Montgomery County affirmed. We reversed, distinguishing that case from *Nunis* on the facts.

In one of the concluding paragraphs in the opinion rendered in the *Osborne* case, we said:

"We will not undertake to establish any factual guidelines for guidance of the Commission controlling the issuance of contract permits, but suffice it to say, that when it appears that there is an existing plurality of common carriers who are willing, ready and able to provide with reasonable efficiency and promptness the service proposed by the applicant for a contract permit, the permit should not be granted, to the end that the financial status and physical assets of the common carriers may be protected against erosion and depletion. Want of such protection is inconsistent with public interest. The Commission here erred in its application of the law, and in overriding ample evidence that sustained the objections of the protesting carriers."

In previous paragraphs in the Osborne opinion, it is shown that there were seven protesting common carriers who had the needed specialized equipment to service the shippers sought to be served by Carroll Trucking Company. All of the common carriers asserted their willingness and ability to meet the transportation requirements of those shippers and they contended that they wanted and *needed* the business of the shippers. The opinion in *Osborne* also contains the following language:

"While it is true that one or more of the customers to be served by Carroll as a contract carrier might be aided and helped in meeting competition, and possibly because of their volume of business they could obtain a competitive advantage, but such competitive help or advantage does not justify the imposition of disadvantages that the common carriers would suffer in the loss of lucrative business by the shifting of carrier service from such common carriers to the contract carrier."

We see no occasion to overrule the opinion in the *Osborne* case, *supra,* nor do we

feel compelled to reaffirm all that is said in that opinion. It is sufficient to say that the facts in the instant case are clearly distinguishable from the facts in *Osborne*.

In the case at bar, the evidence before the Commission showed beyond peradventure that Missouri Portland, in order to carry on its business in this state as it does in other states, needs three trucks at its disposal at all times, which trucks should be kept on the premises of that company. As we have heretofore indicated, despite the tendencies of the evidence to the effect that the protestants would be willing to station three trucks on or near the premises of Missouri Portland, as common carriers they cannot do so. Alabama Public Service Commission v. Nunis, *supra*. In other words, they cannot render to Missouri Portland a service which the evidence without dispute shows that it needs if it is to stay in business and protect an investment of at least $300,000.

In the case at bar, none of the protestants had ever served Missouri Portland except on the one occasion when Miller Transporters, at the request of Schwerman, dispatched a leased truck to Decatur to haul cement on one day for Missouri Portland, although there is evidence that Redwing and Miller Transporters had sought business from that company.

In *Osborne* there was evidence to the effect that the protesting common carriers needed the business of the shippers which Carroll sought to serve. As we have heretofore pointed out, there was no evidence in this case that the protesting carriers needed the business of Missouri Portland or that the service proposed by Consolidated would tend to prevent any of the protesting carriers from being able to render adequate service to the public or in any manner disrupt the business of the protestants.

The Circuit Court of Madison County, in reversing the Commission, held that it had erred in its application of the law. We are in agreement with the trial court.

It follows that the judgment of the Circuit Court of Madison County is due to be affirmed. It is so ordered.

Affirmed.

LIVINGSTON, C. J., and MERRILL, HARWOOD and MADDOX, JJ., concur.