347 So.2d 372 (1977)
JEFFERSON TRUCKING COMPANY, a corporation
v.
ALABAMA PUBLIC SERVICE COMMISSION et al.
SC 2091.
Supreme Court of Alabama.
June 3, 1977.
Rehearing Denied July 8, 1977.
John W. Cooper, of Cooper & Huey, Birmingham, for appellant.
William K. Martin, Montgomery, for appellees Ross Neely Express Inc. and Baggett Transp. Co.
Carl L. Evans and Jerry L. Weidler, Montgomery, for appellees Alabama Public Service Commission and its members.
ALMON, Justice.
Jefferson Trucking Company, appellant, applied to the Alabama Public Service Commission to obtain a contract carrier permit (as opposed to a common carrier certificate). The Commission accepted the report of the examiner who heard the case and denied the application. Jefferson appealed to circuit court, which affirmed the Commission.
Jefferson presently serves National Gypsum Company as a contract carrier on an exclusive basis over interstate routes. National Gypsum has 62 manufacturing facilities, warehouses, and supply centers with sales exceeding $584,000,000. The appellant, Jefferson, has maintenance facilities located at National plant sites in National City, Michigan; Lorraine, Ohio; and Shoals, Indiana. Jefferson presently hauls interstate between National plants at Anniston, Alabama; and Shoals, Indiana. The Shoals, Indiana, plant manufactures gypsum board, which Jefferson hauls to various buyers in Alabama. The Anniston plant is a paper mill which manufactures gypsum board paper. Jefferson, by return trip, carries the gypsum board paper to the Shoals, Indiana, plant for use in its manufacturing process.
*373 By way of Jefferson's intrastate contract carrier application, it seeks to make more efficient use of its truck routes. The raw material for the Anniston plant is 240 tons per day waste paper derived partially (24%) from sources throughout Alabama, including Boy Scouts and church groups. Presently, all the waste paper moving intrastate is by National's trucks (52%) or the vendors' trucks (48%). Jefferson proposes to fill its empty trucks with waste paper on the route between its designation point for a load of gypsum board from Indiana and the Anniston plant where it would receive a load of gypsum board paper for its return trip to Indiana.
Jefferson's application was opposed by two common carriers, Ross Neely Express, Inc. (RNX) and Baggett Transportation Company (Baggett). Neither RNX nor Baggett are currently hauling waste paper for National, though National admits it has not attempted to use common carriers. A witness for National stated that an assured supply of paper has to be coordinated with production requirements, and that over the years, common carriers have not proven satisfactory.
RNX and Baggett testified they are in need of the additional freight, as each has recently laid off personnel for lack of business, and are quite capable of handling the waste paper. RNX has handled a number of shipments of scrap paper, though not for National. Baggett hauled waste paper to the Anniston plant when it first opened in 1956, but lost the business when National started using its own fleet.
The examiner, in concluding that to grant the permit would not be consistent with public interest (Tit. 48, § 301(11)(B), Code of Alabama 1940, Recompiled 1958), made the following findings:
"The Examiner finds from the testimony and the record that both common carriers protesting this application hold what amounts to practically statewide authority from this Commission, that both carriers have terminals located throughout the State of Alabama, and each has a terminal located close by the shipper's facilities outside of Anniston, Alabama. Both carriers have from time-to-time transported shipments of waste paper in the State of Alabama. Due to a decline of business, the carriers are not now utilizing their equipment to the fullest extent and have been forced to lay off employees. The Examiner is of the opinion that the Applicant has failed to show that it would be consistent with the public interest for a grant of this application and is of the opinion that the movement of paper could be adequately handled by common carriers. The Examiner is of the further opinion that the Applicant has failed to show any special need, such as a complete dedication of equipment or any other need, that could not be handled adequately by the existing common carriers. Existing authorized common carriers can provide all of the service which National's witness testified National needs. The common carriers have expenses which must be met and obligations which they must fulfill under the terms of their certificates such as serving small shippers on LTL freight and outlying areas in the State of Alabama where there is very little existing service. In order for the common carriers to maintain the existing level of service and possibly seek to improve the level of service and to render a needed service to the public of the State of Alabama, they should be given the opportunity to transport truckload business, such as the waste paper testified to in this case. Existing authorized common carriers should be given a reasonable opportunity to provide the service needed by National before new authority is granted to Jefferson. The record in this case is clear that National has not attempted to give authorized common carriers a reasonable opportunity to handle National's intrastate shipments of waste and scrap paper in Alabama."
Tit. 48, § 82, Code, supra, provides that the commission's order shall be taken as prima facie just and reasonable, but that the circuit court shall set aside the order if the Commission "erred to the prejudice of *374 appellant's substantial rights in its application of the law," as Jefferson contends it has. We review the order of the Commission as if it were on direct appeal to us, without any presumption as to the correctness of the judgment of the circuit court. A.P.S.C. v. Consolidated Transport Co., 286 Ala. 323, 239 So.2d 753 (1970), and cases cited therein.
Appellant Jefferson Trucking Co. brings to our attention the United States Supreme Court case of I.C.C. v. J-T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961), and cases following J-T Transport: Meatpackers Express, Inc. v. U. S. et al., 244 F.Supp. 642 (D.C., Neb., 1965); Continental Contract Carrier Corp. v. U. S., D.C., 311 F.Supp. 390 (1970); Joe Jones, 103 M.C.C. 934 (1967); Service Transport, Inc., 115 M.C.C. 29 (1972). J-T Transport examined the effect of 1957 amendments to Interstate Commerce Act, Part II (49 U.S. C.A., § 301 et seq.). The amendments were precipitated by the case of U. S. v. Contract Steel Carriers, 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482 (1956) which "held that a contract carrier, rendering a specialized service in the sense that it hauled only a limited group of commodities over irregular routes, did not become a common carrier because it searched for new business within the limits of its license." J-T Transport Co., supra, 368 U.S. at 85-86, 82 S.Ct. at 207. To prevent contract carriers from being able to handle many contracts over its given routes and thereby becoming in the nature of a common carrier, Congress amended the definition of contract carrier in § 203(a)(15) (49 U.S.C.A., § 303(a)(15)) and specified certain considerations in § 209(b) (49 U.S.C.A., § 309(b)). § 203(a)(15) now reads as follows:
"(15) The term `contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation service designed to meet the distinct need of each individual customer."
§ 209(b) was altered, inter alia, by adding the following:
". . .In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in [this Act], the Commission shall consider [1] the number of shippers to be served by the applicant, [2] the nature of the service proposed, [3] the effect which granting the permit would have upon the services of the protesting carriers and [4] the effect which denying the permit would have upon the applicant and/or its shipper and [5] the changing character of that shipper's requirements."
The Court held in J-T Transport Co., supra, that because of these amendments, the Interstate Commerce Commission may not indulge in a presumption in favor of a common carrier over a contract carrier.
". . . We see no room for a presumption in favor of, or against, any of the five factors on which findings must be made under § 209(b). The effect on protesting carriers of a grant of the application and the effect on shippers of a denial are factors to be weighed in determining on balance where the public interest lies. The aim of the 1957 amendments, as we read the legislative history, was not to protect the status quo of existing carriers but to establish a regime under which new contract carriage could be allowed if the `distinct need' of shippers indicated that it was desirable.
. . . . . .
"The proper procedure, we conclude, is for the applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have the ability as *375 well as the willingness to meet that specialized need. If that is done, then the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants.
"Moreover, as we read the Act, as amended in 1957, the standard is not whether existing services are `reasonably adequate.' It is whether a shipper has a `distinct need' for a different or a more select or a more specialized service. The protesting carriers must show they can fill that `distinct need,' not that they can provide a `reasonably adequate service.'" 368 U.S. at 89-91, 82 S.Ct. at 209-210.
Our legislature has not adopted the above amendments. On the contrary, Tit. 48, § 301(11)(B) provides specifically that a contract "carrier may substitute or add contracts within the scope of his permit, . . . as the development of the business and the demands of the public may require" in the same manner as § 209(b) of the Interstate Commerce Act did prior to the amendments. Thus, parts of the above amendments are in contradiction to our statute. Jefferson Trucking would presumedly have us follow J-T Transport as to the remainder of the opinion, with the implication being that the Commission placed too heavy a burden of proof on the appellant, Jefferson Trucking Co.
In A.P.S.C. v. Consolidated Transport, supra, on which appellant also relies, we quoted extensively from A.P.S.C. v. Nunis, 252 Ala. 30, 39 So.2d 409 (1949), part of which we again quote:
"`Attention is called to the difference in the finding necessary for contract carriers, that is, "consistent with the public interest," and for common carriers, that there must be a "certificate of public convenience and necessity." Section 301(8), Title 48, supra.

"`A contract carrier can give preferential service, and is not limited to schedules or routes: a common carrier is thus bound. . . . This carrier cannot extend the preferential service nor other advantages of a contract carrier.

"`. . . It is not a question of whether the public needs this service, as when a common carrier seeks a permit, but whether such service would be detrimental to the public interest.
. . . . . .
"`. . . We think this proposed service would be consistent with the public interest, unless it would probably depreciate materially the ability of the lone common carrier who may be equipped so to engage in serving the public, and who alone is protesting this application. . .'" A.P.S.C. v. Consolidated Transport Co., supra, 286 Ala. at 330-331, 239 So.2d at 760-761.
In view of Nunis, supra, and Consolidated Transport, supra, the Alabama Public Service Commission is not at liberty to indulge in presumptions. See also A.P.S.C. v. Decatur Transfer & Storage, Inc., 257 Ala. 346, 58 So.2d 887 (1952); Osborne Truck Lines, Inc. v. A.P.S.C., 284 Ala. 166, 223 So.2d 284 (1969); Redwing Carriers, Inc. et al. v. Floyd & Beasley Transfer Co., Inc., Ala., 341 So.2d 939 (1977). On the other hand, our legislature has not mandated specific considerations as Congress has done, and we must still begin with the assumption that the Commission's order is prima facie just and reasonable.
The specialized service or distinct need in question here is National Gypsum's desire to coordinate supply with production requirements and to make pick-ups when the vendors of scrap paper are ready, not the need for any specialized equipment that is unavailable from common carriers. National now has 14 tractors and 19 trailers domiciled at its Anniston plant with two units dedicated exclusively to hauling waste paper. If the services of Jefferson were made available, National would reduce its private fleet, though apparently not eliminate it.
Jones, Vice-President of Baggett (protestant), testified that Baggett had previously hauled scrap paper for National between Birmingham and Anniston before National instituted its private fleet. In 1974 Baggett *376 opened a terminal at Anniston, one block from the National plant.
Foster, appearing for RNX, testified that RNX had carried shipments of scrap paper in vans during January and February, 1975, just before the hearing, though it had never handled shipments for National. RNX has a terminal within 3 or 4 miles of the National plant and would be willing to hold a shipment there. It holds out overnight service and will furnish services 24 hours a day, 7 days a week.
As we noted earlier, the examiner found that "the movement of paper could be handled adequately by common carriers" and that "[e]xisting authorized common carriers can provide all of the service which National's witness testified National needs."
While National has shown a preference for private or contract carriage over common carrier, neither Jefferson nor National has shown a need that cannot be filled, as distinct from reasonably adequately serviced, by common carriers. The added plus in Jefferson's favorthat approval of its application would increase efficiency and conserve energyis a factor to be considered, but is outweighed by the needs of the common carriers in light of their ability to provide the service.
The decision of the circuit court is affirmed.
AFFIRMED.
TORBERT, C. J., and BLOODWORTH, MADDOX, FAULKNER, SHORES, EMBRY and BEATTY, JJ., concur.
JONES, J., dissents.
JONES, Justice (dissenting):
I respectfully dissent.
If ever a set of facts overwhelmingly cried out in favor of granting an application for a contract carrier permit, it is presented in this case. National Gypsum is in need of a hauler. Jefferson Trucking is exclusively dedicated to National's hauling needs. National is currently supplying its own needs for incoming scrap paper; and this practice evolved from its past bad experience with common carriers. If Jefferson obtains the contract carrier permit, a substantial portion of this specialized and distinct hauling need will be shifted from National to Jeffersona management policy decision which National alone is competent to make. In no event will it go to Baggett or RNX, neither of whom has had or has sought this freight.
National's decision to deal exclusively with Jefferson (or, if the permit is denied, to continue the use of its own equipment) is not an arbitrary one in favor of Jefferson; nor is it biased against these particular protesting common carriers. The uncontroverted testimony of National's plant manager makes clear that the volume of paper used, the timeliness of its use, and lack of storage space require a highly proficient operation in the supplying of this raw material in the manufacturing process. The continuous and uninterrupted plant operation is dependent upon the right amount of scrap paper at the right time at the right place. This need can be met, in the opinion of National, in only two ways: First, as National is now operating by using its own equipment; or, second, through the service of a contract carrier over whom National has virtually exclusive control. Only Jefferson fits the latter choice; and this for the reason that Jefferson devotes 100% of its trucking operation to the service of National. This particular arrangement places Jefferson in practically the same position in meeting National's hauling needs as if National were using its own rolling stock.
The cases make clear (the very ones cited in the majority opinion) that the statutory criteria for granting the permit is complied with unless it would not be consistent with the public interest. Just how the protestants have met the burden of showing "not consistent with public interest", either from the record or from the rationale of the majority opinion, totally escapes me. If I understand the majority opinion, it holds that increased efficiency of production and energy conservation are matters not in the public interest, notwithstanding the absence of valid countervailing considerations.
*377 It becomes increasingly apparent to me that a lot more people talk "free enterprise and competitive economy" than really believe or practice those precepts. These are ideals to be given lip service but that seem to have fewer and fewer practicing adherents in the day-to-day market place. This tendency to abandon traditional concepts of a free economy consists in society's compulsion to overregulate itself. Regulations and the accompanying regulatory agencieswhose avowed purpose is to insure competition in a free enterprise system (thus permitting monopolies under controlled structure) become the very tools to destroy that which it was conceived to protect. The servant has become the master; the guardian the prey; the hunter the hunted; and the means the end. The shield of protection is transformed into the sword of destruction.