ALMON, Justice.
By application of September 27, 1974, Rev. O. D. Hill of Lanett, Alabama seeks authority to institute a new operation as a contract carrier by motor vehicle to transport, in intrastate commerce over irregular routes, school children and groups, and church children and groups from Chambers, Randolph, Lee or Tallapoosa Counties to any point in Alabama.
The Commission treated the application as one for a common carrier rather than a contract carrier, and approved it upon finding that the applicant is fit, willing, and able to properly perform the proposed service, and that the service is or will be required by the present or future public convenience and necessity, as required by Tit. 48, § 301(9), Code of Alabama 1940, Recompiled 1958. Commissioners Hammond, Zeigler, and McDaniel were at the hearing and rendered the decision of the Commission. The protestants, Continental Crescent Lines, the Alabama Bus Association, Greyhound Lines, Inc., and Ingram Bus Lines appealed to the Circuit Court via Tit. 48, § 301(27), which reversed the Commission.
The issues presented are (1) whether adequate notice was given, (2) whether the Commission erred to the prejudice of the protestants’ (appellees’) substantial rights in its application of the law or based its *1138 order on findings of fact contrary to the substantial weight of the evidence (See Tit. 48, § 82, Code) and (3) whether the Commission has the authority to issue a certificate for charter authority over irregular routes where the applicant does not also request a regular route or routes between fixed termini. We affirm the circuit court’s decision (reversing the Commission) on the first and second issues, and pretermit discussion of the third.
Tit. 48, § 82, Code of Alabama 1940, Recompiled 1958, provides the scope of review for appeal to the circuit court:
“§ 82. Proceedings on appeal. — The commission’s order shall be taken as pri-ma facie just and reasonable. . [T]he court . . . shall set aside the order if the court finds that: the commission erred to the prejudice of appellant’s substantial rights in its application of the law; or, the order, . . . was based upon a finding of facts contrary to the substantial weight of the evidence.
We review the decree of the circuit court without any presumption of its correctness. “We are governed by the same rules in our review as was the circuit court, so we will review the order of the Commission as though the appeal from the Commission’s order had been taken directly and primarily to this court.” Alabama Pub. Serv. Com’n v. Consolidated Transp. Co., 286 Ala. 323, 325, 239 So.2d 753, 755 (1970), and cases cited therein.
At the hearing before the Commission, Rev. Hill testified that he was the pastor of four churches including Fairfax Baptist Church. Rev. Hill did not own any buses at the time of the application, but proposed to buy a 1964 model 4106 and a 1954 model 4104. Testimony by the protestants indicated that used buses cost $8,000 to $12,000 with new engines costing $5,000 to $6,000. Rev. Hill did not file a financial statement, and was not aware of the cost of insurance, though he did establish that a company would write the insurance. His main concern was to transport the people of his churches and other local churches to various nearby functions. According to Rev. Hill, these people are unable to charter the existing common carriers operating in the area because of the deadhead expense (60$ per mile per bus) of getting Greyhound buses from' Columbus, Georgia, about 40 miles from Lanett, Alabama, or Ingram buses from Tallassee, Alabama, about 54 miles from Lanett, or Crescent buses from Birmingham, Alabama, about 131 miles from Lanett.
Nine people, including ministers, school principals, and a superintendent of schools, testified for Rev. Hill. The gist of their testimony is in agreement with Rev. Hill’s, namely, that while charter service is available, the parties cannot afford the deadhead cost. The principals and superintendent of the Lanett schools testified that the school system did not own any buses, that they have satisfactorily used Greyhound and Ingram previously, but that they could not afford to do this for short class trips such as to a science fair at Auburn, Alabama.
The protestants testified that to allow Rev. Hill to have the “cream” of the business (charter authority) without requiring him to maintain regular routes would diminish their ability to maintain regular routes. More specifically, Mr. Bowman, testifying for Greyhound, stated that Greyhound, Eastern Division, received $1.1552 revenue per passenger mile from its regular route service and charter operations. The operating expenses were $1.06 per passenger mile, and the charter revenue of 9.56$ per passenger mile provided the cushion of operating revenue over expenses. Similarly, Mr. Ingram of Ingram Bus Lines of Tallassee, Alabama, testified that his cost per mile on scheduled runs was 56.24$ while his revenue was 23.75$, and that he'needed the charter runs to make up the difference. According to Mr. Ingram, Rev. Hill’s charter authority would cover approximately 75% of the area over which Ingram’s authority extends.
Between December, 1974, and December, 1975, Greyhound derived $15,945.76 in charter revenues from Rev. Hill’s proposed area, based on their Columbus Georgia, records; *1139 some revenue was also generated out of their Montgomery office. Crescent derived charter revenue of $21,725.66 from the area in 1974. Ingram received approximately $1,500.00 from Lanett High School during 1974.
On the other hand, Crescent had not originated any charter trips in 1974 from the City of Lanett, and had originated only one trip from the churches Rev. Hill seeks to serve, though a few trips originated from other churches. Ingram has received charter business from Lanett, Fairfax and Langdale areas but in the last two years had not received any charter business from the churches sought to be served.
I
The protestants question the adequacy of a notice stating that the applicant sought to operate as a contract carrier, rather than as a common carrier:
“Institute a new operation as a CONTRACT CARRIER by motor vehicle, in intrastate commerce over IRREGULAR ROUTES, in the transportation of: School children and groups and church children and groups from Chambers, Randolph, Lee or Tallapoosa Counties, Alabama, to any point in Alabama.”
The “Report and Order of the Commission” nevertheless treated the applicant as a common carrier. “The application seeks authority to operate as a contract carrier, however, the evidence presented was that of a common carrier and no written contracts were offered, therefore, the Commission is treating the application as a common carrier application.”
According to Tit. 48, § 301(8)(B), in the case of an application for a common carrier to transport passengers, notice shall be given to each common carrier of passengers operating in the proposed territory. If the application is to transport freight, then notice shall be given to each common carrier of freight in the proposed area. Similarly, according to § 301(11)(B), if the application is for a contract carrier to transport passengers, notice shall be given to every contract carrier of passengers, and if for a contract carrier of property, then notice shall be. served on every contract carrier of property, then operating in the proposed area.
Apparently, the appellees, who are common carriers of passengers operating in the proposed area of Rev. Hill’s application, did receive notice. On the practical side, we believe the preferable procedure is to give notice to both common carriers and contract carriers, as oftentimes their interest may be adverse. See Osborne Truck Lines, Inc. v. Alabama Pub. Serv. Com’n, 284 Ala. 166, 223 So.2d 284 (1969). However, the notice given is nevertheless legally insufficient. Common carriers and contract carriers have entirely different scopes of operation and grants of authority. See Alabama Pub. Serv. Com’n v. Consolidated Transp. Co., supra. The notice provision quoted above was one of 18 notices of contract and common carrier applications appended together, covering five days of hearings. In each case, the notice stated in bold type whether the application was for a contract carrier or a common carrier. Should we assume that everyone who received the notice realized what the application was for? We do not believe so, and hold that when notice is given that an applicant seeks a contract carrier permit, the Commission may not then grant a common carrier certificate.
II
Tit. 48, § 301(9)(A) provides that a certificate for common carriage shall be granted “if it is found . . . that the applicant is fit, willing, and able to properly perform the service proposed and to conform with the provisions of this article and requirements, rules and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate is or will be required by the present or future public convenience and necessity; . . . ” The protestants contend that nothing in the record supports the Commission’s finding that the applicant is fit, willing, and able to properly perform his proposed service. We agree.
*1140 The applicant appeared before the Commission pro se without investigating how he was going to obtain the necessary equipment, without knowing what expenses and capital investment he would incur, and without making any showing of his own financial resources. While we shall not outline specifically what “fit, willing, and able to properly perform” means — that task falls primarily within the expertise of the Commission, and would, of course, depend on the individual circumstances — we note, however, at the least, the Commission is required by § 301(9)(B)(2) to consider the financial ability of the applicant. In this case, the applicant made no showing of how he was going to physically perform the service he proposed.
We have already concluded that proper notice was not given. We also hold that for the Commission to find that an applicant is fit, willing, and able, sufficient evidence must be in the record to support that conclusion, though we- leave to the expertise of the Commission to determine what constitutes a fit, willing, and able applicant.
We add, parenthetically, for the guidance of the applicant and the Commission that cost, per se, will not normally support the conclusion that a proposed service is required for public convenience and necessity. Osborne Truck Lines, Inc. v. Alabama Pub. Serv. Com’n, supra; Alterman Transport Lines, Inc. v. U. S., 361 F.Supp. 664 (D.C.1973). However, when costs are in effect an embargo, the matter of rates need not be entirely excluded from consideration. Alterman Transport Lines, Inc. v. U. S., supra; I.C.C. v. J-T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).
“ . . . This does not mean that the lawfulness of rates would be injected into certificate proceedings. The issue of whether or not the proposed service offers a rate advantage and if so whether such advantage establishes a ‘need’ for the service that overrides counterbalancing considerations presents issues that fall far short of a rate proceeding.” J-T Transport, supra, 368 U.S. at 92, 82 S.Ct. at 211.
The judgment of the Circuit Court, which reversed the Commission, is affirmed.
AFFIRMED.
BLOODWORTH, JONES and EMBRY, JJ., and SIMMONS, Retired Circuit Judge, sitting by designation of the Chief Justice, concur.